JULIA G. STURGES & another[1] vs. TOWN OF CHILMARK
& others.[2]

Dukes County. December 6, 1979. — March 27, 1980.

Present: HENNESSEY, C.J., QUIRICO, WILKINS, LIACOS, & ABRAMS, JJ.

*Zoning*, Validity, Exceptions, Limitation on rate of development, Lot
size, Standing to challenge zoning provisions. *Subdivision Control*,
Limitation on rate of development, Exemption. *Constitutional Law*,
Zoning. *Words*, "Adjoining."

In an action challenging the validity of a provision of a town's zoning
    by-law which authorized the board of appeals to grant a special per-
    mit to build a single-family dwelling on an undersized lot, provided
    the applicant had not attained his thirtieth birthday and had been a
    resident of the town for eight consecutive years, landowners had
    standing under G. L. c. 240, § 14A, to challenge the age and residency
    limitations of the by-law [248-249]; however, there was no merit to
    their claim that they were entitled to sell their undersized lots pursuant
    to the by-law to persons who did not meet the age and residency
    requirements of the by-law [249-250].
A town had authority under St. 1975, c. 808, The Zoning Act, to adopt
    a rate of development by-law which imposed time based zoning con-
    trols on local development. [250-255]
A zoning change adopted by a town on Martha's Vineyard which imposed
    time based zoning controls on local development had a rational basis
    when considered in terms of the general public interest in regulating
    development on Martha's Vineyard and the specific concerns over sub-
    soil conditions in the town and was, therefore, constitutional in the
    circumstances. [255-260]
Unregistered land in a town was subject to the provisions of the Subdivi-
    sion Control Law even though the land was shown on subdivision
    plans recorded before the effectiveness of the Subdivision Control Law
    in the town. [260]
Lots that come together only at one point are not adjoining within the
    meaning of G. L. c. 40A, § 6. [260-261]

[1] Eleanor D. Pearlson.

[2] The various members of the Chilmark Planning Board, as they are
members of the board.

PETITION filed in the Land Court on November 17, 1977. The case was heard by *Randall, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Thomas B. Bracken* for the defendants.

*Eugene L. Tougas* for the plaintiffs.

*Howard R. Palmer,* Assistant Attorney General, for the Commonwealth, amicus curiae, submitted a brief.

WILKINS, J. The plaintiffs, who jointly own several parcels of land in the Martha's Vineyard town of Chilmark, commenced this proceeding in the Land Court in November, 1977, seeking a determination concerning certain statutory and local regulatory provisions which might be applied to restrict their right to use and develop their land.

The issues, which are before us on the cross appeals of the plaintiffs and the town, principally concern two zoning by-law amendments adopted by the town in March, 1976. One of these zoning changes created, for certain younger Chilmark residents, a youth lot exemption from lot size requirements. The other zoning change imposed time based restrictions on the construction of residential dwellings in the town. The judge ruled that the plaintiffs lacked standing to challenge the youth lot by-law and thus did not pass on its constitutionality. He ruled that the rate of development by-law was unconstitutional. Additionally, the plaintiffs challenge the Land Court judge's ruling that their unregistered land shown on certain subdivision plans was subject to the Subdivision Control Law. Finally, the town challenges the judge's ruling that two lots which meet at a point are not "adjoining" within the meaning of the word in G. L. c. 40A, § 6, and thus, in the circumstances, each is a buildable residential lot. We granted the town's application for direct appellate review.

We conclude that the plaintiffs have standing to challenge the youth lot by-law but are not entitled to the relief they seek; that they have standing to challenge the rate of development by-law but that they have not established its unconstitutionality; and that the judge was correct in ruling

that (a) certain of the plaintiffs' land shown on recorded subdivisions is subject to the Subdivision Control Law, and (b) two of the plaintiffs' lots meeting at a point are not "adjoining" within the meaning of the word in G. L. c. 40A, § 6.[3]

1. At a special town meeting, held on March 15, 1976, the town adopted an exception to the minimum lot size requirements of its zoning by-law. This exception, which has been characterized as the youth lot by-law, was adopted "[f]or the purpose of helping young people who have grown up in Chilmark and lived here for a substantial portion of their lives and who, because of the rising land prices, have been unable to obtain suitable land for their permanent homes at a reasonable price, and who desire to continue to live in Chilmark." The by-law authorizes the town's board of appeals, subject to certain conditions, to grant a special permit to build a single-family dwelling, generally for owner occupancy, on an undersized lot, provided the applicant has not attained his thirtieth birthday and has been a resident of the town for eight consecutive years. One such permit may be issued for every thirty-six acres held in common ownership on the effective date of the by-law.

The judge of the Land Court declined to pass on the validity of the youth lot by-law because he concluded that the plaintiffs lacked standing to challenge the by-law since they were benefited rather than harmed by it. It is not clear what arguments the plaintiffs presented in the Land Court. Their complaint sought a determination that the youth lot by-law was invalid but only as to two lots, which, as will be seen, are exempt in any event from the minimum lot requirements.[4] Before us, the plaintiffs argue that they should be entitled to sell all their "under-three-acre lots affected by" the youth lot by-law "without regard to the age,

---

[3] Chilmark has a minimum area requirement of three acres for a residential lot in all but two small areas of the town. The plaintiffs do not challenge this aspect of the town's zoning by-law.

[4] See our discussion, *infra*, in part 4 of this opinion.

residence or economic condition of the purchaser." All undersized lots appear to be "affected by" the youth lot by-law. The nature and scope of the plaintiffs' claim, as applied to their land, is unclear.[5]

In so far as the plaintiffs assert a right to sell undersized lots (at least one for each thirty-six acres of commonly held land) without regard to the age or residency of the purchaser, they have standing to challenge the by-law. G. L. c. 240, § 14A. They are objecting to the by-law's age and residency restriction or limitation on their right to sell undersized lots and as the owners "of a freehold estate in possession" may bring a petition in the Land Court against the town "for determination as to the validity of a . . . by-law" in the respect claimed. G. L. c. 240, § 14A, as amended by St. 1975, c. 808, § 5. See *Harrison* v. *Braintree*, 355 Mass. 651, 654 (1969). We view § 14A, a remedial statute, as intended to permit any landowner to petition for a decision concerning the validity or invalidity of any zoning restriction applicable to his land. *Id.* at 654-655. *Addison-Wesley Publishing Co.* v. *Reading*, 354 Mass. 181, 184-185 (1968).

The plaintiffs' argument appears to rest on the fallacious assumption that, if the age and residency requirements of the by-law were struck, special permits could be obtained generally under what remained of the by-law. Considering the clearly expressed purpose of the by-law, that assumption cannot be accepted. If the age and residency provisions were not in the by-law, the town would not have adopted it. Consequently, the entire youth lot by-law would have to be treated as a nullity if the age and residency requirements were invalidated. Hence, the plaintiffs' position that they

---

[5] The plaintiffs argue that the limitation of one youth lot for each thirty-six acres of commonly owned land is invalid because it lacks a rational basis. It is unclear whether the point was raised below. In any event, assuming the youth lot by-law were valid otherwise, the plaintiffs have not shown that the restriction is unreasonable. This is particularly so in a town having 10,500 acres and a total permanent population of approximately 400.

may rely on the youth lot by-law with its allegedly invalid conditions excised is unsupportable, and the affirmative relief which they seek cannot be granted.

The plaintiffs have sought declaratory relief, however, and are entitled to a declaration concerning the issue on which they seek an answer. A judgment should be entered, in this aspect of the case, stating that the plaintiffs are not entitled to sell any of their under-three-acre lots for residential uses pursuant to the terms of the youth lot by-law to persons who do not meet the age and residency requirements of the youth lot by-law. This declaration disposes of the position for which the plaintiffs have argued, as far as we can determine. It will be within the judge's discretion to permit the plaintiffs to amend their complaint to seek declaratory relief concerning the youth lot by-law in other respects.

2. At the March, 1976, special town meeting, the town adopted another amendment to its zoning by-law, this one concerning the "rate of development" of real estate in the town. The parties construe this by-law, which is set forth in full in the margin,[6] as limiting the issuance of building

---

[6] "ARTICLE 7 SECTION VI: Rate of Development

"Section 7.0 1. Building permits for the construction of dwellings on lots held in common ownership on the effective date of this provision shall not be granted at a rate per annum greater than as permitted by the following schedule commencing in the year such lots are subdivided or in the year this provision becomes effective, whichever is later.

"Section 7.1 a. For such lots containing a total area of land sufficient to provide more than ten dwellings at the maximum density permitted for the District in which such lots are located; one tenth of the number of dwellings permitted to be constructed or placed on said total area of land based on said maximum permitted density.

"Section 7.2 b. For such lots containing a total area of land insufficient to provide ten or more dwellings at the maximum density permitted under these By-Laws for the District in which such lots are located; one dwelling.

"Section 7.3.2 Any lots in a subdivision covered by this provision hereafter sold or otherwise transferred to another owner shall include in the deed the earliest date on which construction may be commenced in accordance with these provisions."

permits for residential construction to one-tenth of the lots in a "subdivision" in the year the lots are subdivided and a further one-tenth of those lots in each of the subsequent nine years.[7]

The plaintiffs present what they characterize as a facial attack on the rate of development by-law, arguing that the town lacked statutory authority to adopt it and that it is unconstitutional. We agree with the judge of the Land Court that the plaintiffs have standing to challenge the validity of the rate of development by-law. The by-law affects the ready marketability of their property. In any event, from our previous discussion concerning the plaintiffs' standing to challenge the youth lot by-law, we think it clear that under G. L. c. 240, § 14A, the plaintiffs have standing to challenge the application of the rate of development by-law to their property.

The authority of a municipality to impose time based zoning controls on local development has been the subject of considerable litigation and discussion.[8] The first question

---

[7] In an area of land comprising ten lots or less, one lot each year can be developed for residential use. Lots can be sold at any time for construction of houses in designated future years.

The ten-year period applicable to newly subdivided land commences only when the "lots are subdivided." Thus the rate of development by-law has the potential of limiting construction in the town over an indeterminate period.

The interpretation and application of this by-law in particular circumstances are not at issue in this case.

[8] See, in addition to authorities discussed in the text of this opinion, *Associated Home Builders of Greater Eastbay, Inc.* v. *Livermore*, 18 Cal. 3d 582, 608-610 (1976); *Beck* v. *Raymond*, 118 N.H. 793, 801 (1978); Freilich & Ragsdale, Timing and Sequential Controls — The Essential Basis for Effective Regional Planning: An Analysis of the New Directions for Land Use Control in the Minneapolis-St. Paul Metropolitan Region, 58 Minn. L. Rev. 1009, 1048-1058 (1974); Ellickson, Suburban Growth Controls: An Economic and Legal Analysis, 86 Yale L.J. 385 (1977); Comment, The Limits of Permissible Exclusion in Fiscal Zoning, 53 B.U.L. Rev. 453 (1973); Note, Time Controls on Land Use: Prophylactic Law for Planners, 57 Cornell L. Rev. 827 (1972); Note, Phased Zoning: Regulation of the Tempo and Sequence of Land Development, 26 Stan. L. Rev. 585 (1974); Comment, Stop-gap and Interim Legislation, A Device to Maintain the Status Quo of an Area Pending the Adoption of a Comprehensive Zoning Ordinance or Amendment Thereto, 18 Syracuse

in such a case is whether the municipality had statutory authority to *act as it did. Next, there often is, as here, the claim that there is a denial of due process of law on the ground that there is no rational basis for the limitations imposed.[9] This court has not often dealt with time-based zoning limitations. We did deal with such a provision in *Collura* v. *Arlington,* 367 Mass. 881 (1975), where, under prior zoning enabling legislation, we upheld a two-year moratorium on the construction of apartment houses in certain areas of the town. We held that that form of interim zoning, enacted to prevent uncontrolled growth pending the town's review of its comprehensive plan, was authorized by statute and that the plaintiff had failed to demonstrate that the zoning provision was unrelated to the furtherance of any of the general objects of The Zoning Enabling Act. *Id.* at 886-887. However, no constitutional question was presented in the *Collura* case, and the by-law restriction was of limited effect because it applied only to apartment house uses for a period of two years.

A Massachusetts city or town has the authority to adopt zoning measures which control orderly growth. We hold that a municipality may impose reasonable time limitations on development, at least where those restrictions are tempo-

---

L. Rev. 837 (1967). See generally 2 R. Anderson, American Law of Zoning §§ 10.01 et seq. (2d ed. 1976 & Supp. 1979); 1 A. Rathkopf, Zoning and Planning §§ 11.01 et seq. (4th ed. & Supp. 1979); Annot., 63 A.L.R.3d 1184 (1975); Annot., 30 A.L.R.3d 1196 (1970).

Cases upholding temporary land use restrictions while a plan was being prepared are collected in ALI Model Land Development Code § 7-205, at 305 (Proposed Official Draft 1975).

[9] There is also the possibility, not shown to be present on the facts of this case, that the local regulation in its effect constitutes a taking of the property of the landowner. The question is whether a diminution in value as a result of local regulation amounts to an unconstitutional deprivation of a landowner's property. Resolution of the issue of diminution in value depends on the circumstances of the case, including the nature and significance of the public interest purportedly protected by the regulation. See *Turnpike Realty Co.* v. *Dedham,* 362 Mass. 221, 235-237 (1972), cert. denied, 409 U.S. 1108 (1973); *Commissioner of Natural Resources* v. *S. Volpe & Co.,* 349 Mass. 104, 108-111 (1965).

rary and adopted to provide controlled development while the municipality engages in comprehensive planning studies. The purposes of The Zoning Act, inserted by St. 1975, c. 808, support such limitations.[10] A municipality may enact zoning provisions to deal with a variety of matters, including fire safety; density of population and intensity of use; the adequate provision of water, water supply, and sewerage; the conservation of natural resources; and the prevention of pollution of the environment. See St. 1975, c. 808, § 2A. From the wide scope of the purposes of The Zoning Act, it is apparent that the Legislature intended to permit cities and towns to adopt any and all zoning provisions which are constitutionally permissible, subject, however, to limitations expressly stated in that act (see, e.g., G. L. c. 40A, § 3) or in other controlling legislation.[11]

In view of our holding that there is statutory authority for time controls in a local zoning regulation, the contest between the town and the plaintiffs over the rate of development by-law moves to the constitutional arena. Elsewhere, particular time restraints on development have been upheld as constitutional. See, e.g., *Construction Indus. Ass'n* v. *Petaluma*, 522 F.2d 897 (9th Cir. 1975), cert. denied, 424 U.S. 934 (1976);[12] *Golden* v. *Planning Bd. of Ramapo*, 30

---

[10] The new Zoning Act, enacted in 1975 (see St. 1975, c. 808), applies to Chilmark's development by-law which the town adopted in March, 1976. Statute 1975, c. 808, § 7, provides that the new act shall take effect on January 1, 1976, as to zoning by-laws and amendments (other than zoning map amendments) adopted after that date.

[11] The stated, permissible purposes of zoning under the 1975 Zoning Act (St. 1975, c. 808, § 2A) are broader than those expressed in the 1954 Zoning Enabling Act (St. 1954, c. 368, § 2). Compare former G. L. c. 40A, § 3 (St. 1954, c. 368, § 2, as amended by St. 1956, c. 586) with St. 1975, c. 808, § 2A, stating the purpose of the 1975 act. As to zoning objectives, St. 1975, c. 808, § 2A, after referring to the Home Rule Amendment, states: "This section is designed to *suggest* objectives for which zoning might be established which include, but are not limited to, the following: —" (emphasis supplied).

[12] The city of Petaluma, forty miles north of San Francisco, was greatly affected by the growth of population in the Bay Area during the first part of the last decade. The city adopted a plan which for a five-year period

N.Y.2d 359, appeal dismissed, 409 U.S. 1003 (1972).[13] In these cases, and in most cases involving time restraints on residential development, the affected municipality has been a suburb directly in the path of growth of an expanding metropolitan area. A rarer case is that of an isolated, substantially rural area, such as Chilmark, which wants to preserve its character or at least guard against unforeseen, adverse consequences of too rapid development.

Although the difference between suburban and rural development may be only a matter of degree and the basic constitutional principles are the same, the considerations, and the weight to be given to various factors, may differ. Regional needs, which are often important considerations

---

set a quota on the number of dwelling units that could be constructed in any year in subdivisions above a certain size. The Court of Appeals for the Ninth Circuit upheld the plan against a challenge that it was unreasonable and thus violative of the due process clause of the Fourteenth Amendment. Recognizing that the plan was exclusionary to a degree, the court determined that the exclusion bore a rational relationship to a legitimate State interest. The court recognized as a valid zoning objective the city's "desire to preserve its small town character, its open spaces and low density of population, and to grow at an orderly and deliberate pace." *Id.* at 909.

[13] Ramapo, a town within commuting distance of New York city, had developed a master plan and a program for capital improvements to be made over eighteen years. *Id.* at 366-367. By a zoning amendment, the town required the issuance of special permits for the construction of dwellings in subdivisions; permits were to be awarded according to a point system which weighed the availability to the proposed subdivision of certain essential facilities or services. Thus the rate at which residential building permits were to be issued over the eighteen-year life of the program depended on the rate at which the town's capital construction progressed, unless a developer chose to speed issuance of a permit by installing required improvements himself. "The undisputed effect of these integrated efforts in land use planning and development is to provide an over-all program of orderly growth and adequate facilities through a sequential development policy commensurate with progressing availability and capacity of public facilities." *Id.* at 369. The New York Court of Appeals held (5-2) that, although there was no express statutory authorization for "sequential" or "timing" controls, the concept of phased growth was well within the ambit of existing enabling legislation. *Id.* at 376. The court then concluded that the time controls of growth imposed by the town were constitutionally proper, considering their purpose and their impact on both the community and the general public interest.

(*Board of Appeals of Hanover* v. *Housing Appeals Comm. in the Dept. of Community Affairs,* 363 Mass. 339, 383-384 [1973]), may differ between suburban and rural areas, and the exclusionary impact of the municipality's action may be significantly reduced. Thus, in a rural, as opposed to a suburban, setting, where no showing has been made of regional demand for primary housing, the public interest in preserving the environment and protecting a way of life may outweigh whatever undesirable economic and social consequences inhere in partly "closing the doors" to affluent outsiders primarily seeking vacation homes. Consideration of such differences influenced the First Circuit Court of Appeals in *Steel Hill Dev., Inc.* v. *Sanbornton,* 469 F.2d 956 (1st Cir. 1972), to uphold a six-acre zoning provision in a small Belknap County, New Hampshire, town of approximately 1,000 permanent residents.[14] That court was dealing with a large lot zoning requirement unlimited in time. However, in effect, the court's opinion may have granted approval of the challenged zoning provision only for a limited period. The court indorsed it "as a legitimate stop-gap measure," but one that "may well not indefinitely stand without more homework by the concerned parties." *Id.* at 962.

The island of Martha's Vineyard has unique and perishable qualities. It has been the subject of special legislative attention designed to prevent irreversible damage to the island. See St. 1974, c. 637, establishing the Martha's Vineyard Commission. We discussed this legislation in *Island Properties, Inc.* v. *Martha's Vineyard Comm'n,* 372 Mass.

---

[14] The court distinguished cases striking down large lot zoning requirements in suburban areas, saying "[a]ll these cases refer to an unnatural limitation of suburban expansion into towns in the path of population growth where a too restrictive view of the general welfare was taken." *Steel Hill Dev., Inc.* v. *Sanbornton,* 469 F.2d 956, 961 (1st Cir. 1972). The court noted that, in the case before it, there was no already existing demand for suburban expansion but rather a desire to create a demand for vacation and leisure time second homes for "wealthy residents of Megalopolis." *Id.* "These different problems of suburban and rural expansion, their scientific and legal analyses, and their appropriate solutions cannot so easily be equated." *Id.*

216 (1977), but expressed no opinion concerning the legality of rate of development controls that limited building permits to an annual rate not exceeding one-twentieth of the permits issuable under the applicable density guidelines. *Id.* at 225-226, 232. The 1974 act expressed concern that certain developments on the island might irretrievably harm the "natural, historical, ecological, scientific, or cultural values on Martha's Vineyard." St. 1974, c. 637, § 3 (third paragraph). This expression of the public interest in the preservation of the qualities of Martha's Vineyard and the creation of a statutory commission to assist in that preservation are factors to be weighed in considering the plaintiffs' challenge to the rate of development by-law. The concerns to which the town has responded are not simply local. They are regional and have been articulated by the Legislature.

The constitutional test, which is easier to state than to apply, is whether the by-law is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Euclid* v. *Ambler Realty Co.,* 272 U.S. 365, 395 (1926). *Wilbur* v. *Newton,* 302 Mass. 38, 39 (1938), and cases cited. Our role in review of zoning enactments is limited. *Crall* v. *Leominster,* 362 Mass. 95, 100-103 (1972). Every presumption is made in favor of the by-law, and, if its reasonableness is fairly debatable, it will be sustained. *Turnpike Realty Co.* v. *Dedham,* 362 Mass. 221, 233 (1972), cert. denied, 409 U.S. 1108 (1973). The plaintiffs have the heavy burden of showing a conflict with applicable constitutional provisions. See *Moss* v. *Winchester,* 365 Mass. 297, 299 (1974).

Our usual approach to due process challenges to government action affecting economic activity is to inquire whether the challenged measure bears a rational relation to any permissible public object which the legislative body "may plausibly be said to have been pursuing." *Blue Hills Cemetery, Inc.* v. *Board of Registration in Embalming & Funeral Directing,* 379 Mass. 368, 372 (1979). Under this standard, any possible permissible legislative goal which

may rationally be furthered by the regulation will support a measure's constitutionality. Consistent with this rationale, in cases involving challenges to zoning by-laws, a town has been restricted neither to the reasons expressed by its planning board in its statutorily required recommendations to the town meeting (G. L. c. 40A, § 5), nor to arguments which were advanced on the town meeting floor. See *Noonan* v. *Moulton,* 348 Mass. 633, 639 (1965); *Caires* v. *Building Comm'r of Hingham,* 323 Mass. 589, 595 (1949); *Simon* v. *Needham,* 311 Mass. 560, 566 (1942).

Although there is a presumption of the constitutionality of a zoning enactment, and any rational connection between a zoning regulation and a legitimate State interest will sustain the regulation, as a practical matter we have never dealt with a zoning regulation in a vacuum. The circumstances existing in a municipality have always been considered in the process of passing on the constitutionality of a zoning provision. We have expected the municipality to bring forward some indication that the zoning provision has some reasonable prospect of a tangible benefit to the community. *122 Main St. Corp.* v. *Brockton,* 323 Mass. 646, 651 (1949). A showing must be made, on the record, that there was a reasonable basis for the enactment. See *Turnpike Realty Co.* v. *Dedham,* 362 Mass. 221, 234 (1972), cert. denied, 409 U.S. 1108 (1973); *Wilson* v. *Sherborn,* 3 Mass. App. Ct. 237, 240 (1975).

In *Simon* v. *Needham,* 311 Mass. 560 (1942), one-acre zoning for single family homes in a portion of Needham was sustained, largely on the basis of assumptions about the benefits of one-acre house lots over house lots of 10,000 square feet. However, in *Aronson* v. *Sharon,* 346 Mass. 598, 604 (1964), the town's interest in the enhancement of "living and recreational amenities" flowing from leaving land in its natural state could not reasonably support a minimum lot size of 100,000 square feet, as applied to the plaintiffs' land. On the other hand, more focused and tangible concerns, such as the effect of soil conditions on sewage disposal and water supply systems, may justify large lot zon-

ing requirements as reasonably related to a legitimate public interest. See, e.g., *Wilson* v. *Sherborn, supra* (two-acre lot requirement upheld).

We turn then to what the record contains by way of justification for the town's determination to adopt a rate of development by-law. We do not view it to be Chilmark's burden to come forward with proof of those very circumstances whose possible existence it has sought time to investigate. We know, as the judge found, that the town conferred with the Martha's Vineyard Commission and had available a number of studies, including "maps developed by the U.S. Department of Agriculture, Soil Conservation Service, relating to the town of Chilmark which contained information on soil limitations for septic tank sewerage disposal" and "development guidelines established by the Martha's Vineyard Commission." Reliance on such governmental studies and proposals is reasonable as a basis for town meeting action. They were certainly admissible in evidence to show what the town relied on (see *Edelstein* v. *Old Colony Trust Co.,* 336 Mass. 659, 665 [1958]; *Runels* v. *Lowell Sun Co.,* 318 Mass. 466, 470-471 [1945]), and perhaps even to prove the truth of the facts shown in them (see W.B. Leach & P.J. Liacos, Massachusetts Evidence 243 [4th ed. 1967]).[15] Although the studies were not admitted in evidence, we have a general understanding from testimony of witnesses that, because of these studies, reasonable people were concerned over subsoil conditions as they might affect water supplies and sewage disposal. If the studies did not support these concerns, the plaintiffs had the burden of so demonstrating and could have offered them in evidence.

The Land Court judge concluded that, in order to sustain the rate of development by-law, he had to have expert testi-

_____

[15] In *Wilson* v. *Sherborn,* 3 Mass. App. Ct. 237, 241 n.5 (1975), a soil survey of the town prepared by the United States Department of Agriculture Soil Conservation Service was admitted in evidence. It characterized large areas of the town, including the plaintiff's land, as having severe limitations for high density residential development with on-site sewage systems.

mony concerning actual subsoil conditions. He ruled, in effect, that the town had to offer evidence of the objective existence of problems resulting from subsoil conditions. This ruling improperly placed on the town the burden of proof, or at least a burden of coming forward with evidence, concerning actual subsoil conditions. In our view, the burden was on the town only to make a prima facie showing of a rational basis for its action. The town met this burden, not with nebulous claims, but with the presentation of specific, tangible concerns to which sequential or time limitations on development in the town were a reasonable response. If the plaintiffs' land in fact was free from subsoil problems (particularly considered in light of the town's requirement of three acre lots), the plaintiffs had the burden of proving that the subsoil conditions on their property (or some of it) would permit residential development of their property free from any need for delay and further study. The plaintiffs did not make any attempt at such proof.

The plaintiffs' argument is that the rate of development by-law is facially invalid. We think, on the contrary, that a limited restriction on development had a rational basis when considered in terms of the general public interest in regulating development on Martha's Vineyard and the specific concerns over subsoil conditions in Chilmark. The need for time for study provides a rational basis for the by-law's sequential restrictions, at least during the years immediately following its adoption.[16] We are not confronted with a by-law generally designed to exclude persons from acquiring places of permanent residence. We address a

---

[16] We express no view on the application of the rate of development by-law in subsequent years, particularly after the first ten years from its effective date. We assume, in the absence of a contrary showing, that a period of ten years is reasonably necessary to complete all necessary studies and to implement recommendations and that the town will proceed with its studies in good faith. The judge found that certain planning measures had been undertaken already. A very different case would be presented if it were determined that the town was not proceeding with the necessary studies which are said to be the basis for the enactment of the rate of development by-law.

partial and annually relaxing restriction on the construction of what will for the most part be second, or vacation, homes. A Martha's Vineyard town with a permanent residential population of approximately 400 people, an annual budget (in 1975) of $350,000, an area of 10,500 acres, and only five paved public ways had a rational basis for deciding, pursuant to various studies, that it needed time to discover whether it had a serious problem; in what parts of town the problem, if any, existed; and then what should be done about it. In the circumstances, Chilmark was not obliged to conduct the study before adopting a temporary measure to protect the public interest.

The plaintiffs have failed to meet their heavy burden of showing that the rate of development by-law lacked a rational connection with a permissible public purpose. A judgment should be entered declaring that Chilmark's rate of development by-law is statutorily authorized and is constitutional in the circumstances of this case.

3. The judge was correct in ruling that the plaintiffs' unregistered land was subject to the provisions of the Subdivision Control Law, even though their land was shown on subdivision plans recorded before the effectiveness of the Subdivision Control Law in Chilmark. The Subdivision Control Law provides that such recording does not exempt unregistered land within a subdivision "except with respect to lots which had been sold and were held in ownership separate from that of the remainder of the subdivision when said law went into effect." G. L. c. 41, § 81FF, as appearing in St. 1953, c. 674, § 7. See *Toothaker* v. *Planning Bd. of Billerica*, 346 Mass. 436, 439 (1963).

4. The judge was also correct in ruling that the plaintiffs may treat as buildable lots each of two nonconforming lots which "come together at only one point," that is, as the judge stated, two lots whose "relationship to each other is like that of similarly colored squares on a checkerboard." The issue is whether these lots are "adjoining" within the meaning of that word in G. L. c. 40A, § 6, as amended through St. 1977, c. 829, § 3D. Section 6 exempts certain

residential lots from the application of certain increases in area, frontage, width, yard, and depth requirements of a zoning by-law. The plaintiffs' lots would meet all the requirements for such an exemption under § 6, unless, at the time of the recording of the plan, the lots were "held in common ownership with any adjoining land." G. L. c. 40A, § 6. The town argues that lots which meet only at a point are adjoining.[17] The judge stated that "[a] decision that [these lots] . . . are adjoining would upset settled practice" and would allow only one dwelling on the two lots, leaving one lot "abandoned for all practical purposes." He noted that passage between the two lots would not be possible without committing a technical trespass.

The meaning of the word "adjoining" must be arrived at by consideration of the legislative purpose of § 6. The word may have different meanings in different contexts. See *Commonwealth* v. *Curley*, 101 Mass. 24, 25 (1869). In *Sherer* v. *Trowbridge*, 135 Mass. 500, 502 (1883), we noted that a lot might be adjoining another if it had a common boundary only "part way" along the second lot. Section 6 is concerned with protecting a once valid lot from being rendered unbuildable for residential purposes, assuming the lot meets modest minimum area (at 5,000 square feet) and frontage (at least fifty feet) requirements. Requirements of area and frontage, as well as set-back requirements from lot boundaries, are designed to assure a reasonable spacing of dwelling houses. Joining two lots which meet only at a point cannot provide greater connected frontage for either lot, nor can it furnish any additional area accessible from one lot to the other for water supply or sewage disposal purposes, for example. Practical considerations thus support our conclusion that § 6 was not intended to restrict residential use of two otherwise qualifying adjacent lots which meet only at a point.

---

[17] Apparently the town argues that only one lot is buildable. A reasonable inference from the purpose of § 6 is that, even if the lots were "adjoining," a single residential use could be made of the lots in combination. The judge properly took this view.

5. We affirm those portions of the amended judgment which determined (a) that the Subdivision Control Law applies to the plaintiffs' unregistered subdivision lots, and (b) that lots that come together only at one point are not adjoining within the meaning of G. L. c. 40A, § 6. Of course, that portion of the judgment from which no appeal was taken stands. The judgment is reversed in so far as it determined that the plaintiffs did not have standing to challenge the youth lot by-law, and a new declaration shall be made (unless the plaintiffs seek to amend their complaint in this respect) stating that the plaintiffs are not entitled to sell any of their under-three-acre lots for residential purposes pursuant to the terms of the youth lot by-law to persons who do not meet the age and residency requirements of that by-law. Finally, that portion of the judgment that determined the rate of development by-law was invalid is reversed. A new declaration shall be made stating that the rate of development by-law was authorized by statute and that, as applied to the plaintiffs in the circumstances of this case, the rate of development by-law is constitutional. In the judge's discretion, a new judgment consolidating the conclusions expressed in this paragraph may be entered.

*So ordered.*