# W. R. Grace & Co.-Conn. & another[1] vs. City Council of Cambridge & another.[2]

No. 00-P-27.

Suffolk. December 11, 2001. - November 25, 2002.

Present: Brown, Lenk, & Cowin, JJ.

*Practice, Civil,* Moot case. *Zoning,* Amendment of by-law or ordinance, Spot zoning. *Municipal Corporations,* Police power. *Constitutional Law,* Police power, Taking of property. *Due Process of Law,* Taking of property.

This court declined to dismiss, on the grounds of mootness, an appeal regarding the validity of certain expired zoning amendments, where the issue was one of public importance; where it was fully argued on both sides; where the question was certain, or at least very likely, to arise again in similar factual circumstances; and where appellate review could not be obtained before the recurring question would again be moot. [564-565]

In an action in Land Court challenging zoning amendments adopted by the city of Cambridge that effectively froze a landowner's development plans for a period of twenty-three months, the judge properly concluded, on motions for summary judgment, that the amendments were within the lawful ambit of the city's authority under the Zoning Act, G. L. c. 40A, §§ 1 et seq., and did not exceed the city's police power or constitute illegal reverse spot zoning, where the evidence demonstrated that the amendments had a substantial relation to a permissible public objective (i.e., to provide interim zoning for the purpose of preserving the status quo during a study anticipating permanent zoning changes), and where the landowner had no reasonable expectation of proving otherwise at trial. [565-572]

A Land Court judge correctly concluded that zoning amendments adopted by the city of Cambridge, which effectively froze a landowner's development plans for a temporary period, did not constitute a regulatory taking of property for which the landowner was entitled to compensation, where the landowner failed to demonstrate that the amendments, rather than its own activities or decisions, directly resulted in a negative economic impact; that the amendments interfered with the landowner's investment-backed expectations to an unreasonable extent; or that the nature of the governmental action was such as would constitutionally compel compensation. [572-575]

Civil action commenced in the Land Court Department on January 6, 1997.

---

[1] Alewife Land Corporation.

[2] The city of Cambridge.

The case was heard by *Leon J. Lombardi*, J., on motions for summary judgment.

*John Kenneth Felter (Michael Murray* with him) for the plaintiffs.

*Brian C. Levey* for the defendants.

COWIN, J. W. R. Grace & Co.-Conn. and Alewife Land Corporation (collectively, Grace) challenge certain zoning amendments adopted by the city of Cambridge (the city) that effectively froze Grace's development plans for a period of twenty-three months. A judge of the Land Court allowed summary judgment in favor of the city, while simultaneously denying Grace's motion for summary judgment. On appeal, Grace asserts (1) the amendments exceeded the city's police powers as expressed in G. L. c. 40A, §§ 1 et seq. (the Zoning Act); (2) the amendments constituted "reverse" spot zoning, and were therefore unlawful; and (3) regardless of the validity of the amendments, the amendments constituted a "regulatory taking" of property for which Grace is constitutionally entitled to compensation. Thus, we enter the dense thicket of court decisions that have sought to establish the boundary between private property rights and permissible governmental action limiting the value of those rights. Complicating the analysis in this particular case is the fact that a summary judgment decided the outcome; accordingly, we must examine not only whether correct principles of law were applied, but also whether summary judgment was appropriate. After consideration of each factor, we affirm the judgment of the Land Court.

1. *Undisputed facts and prior proceedings.* Grace owns a parcel of land in North Cambridge containing approximately twenty-nine acres (the locus). Grace acquired the property in 1954. Chemical products were manufactured in facilities located there until 1974. Prior to 1977, the zoning district in which the locus was situated was designated "Industry B," wherein industrial uses were permitted as of right.[3] In 1977, Cambridge amended its zoning ordinance by, among other things, designating the zoning district "Industry C," which restricted building

---

[3]The only limitation at that time was a maximum floor area ratio of 4.0, the ratio generally defining the relationship between floor area in the buildings and the ground space of the locus.

height to forty-five feet and allowed a maximum floor area ratio of 1.0. This district was the only Industry C zoning district in the city. Most of the property within the district is owned by Grace, the remainder consisting of a two-family house and a small parcel owned by the Metropolitan District Commission.

During and subsequent to 1977, other zoning actions affected the locus. The city first created a Planned Unit Development Overlay district applicable to Industry C districts, and thus applicable to the locus, that imposed certain minimum open space and landscaping requirements but permitted increases in building height to eighty-five feet and in floor area ratios to 2.0. Development within the Planned Unit Development district required the issuance of a special permit by the Cambridge planning board. In 1982, the city placed a portion of the locus in a Flood Plain Overlay district, which also prohibits any construction within the Overlay district without issuance of a special permit by the planning board.

In 1987, Grace, through an agent, applied for and received a special permit to develop a portion of the locus. The development, called Alewife Center, called for a hotel and six office buildings with associated retail uses, with the total contemplated new space exceeding one million square feet. There would also be accessory parking for more than 2,300 automobiles. The special permit authorized construction to proceed in phases between 1987 and 1994. The first building (Alewife Center One) was completed and occupied in 1989. Grace expended other funds in connection with its intention at that time to develop the property further.

In 1989, Grace sought and received an amendment to the special permit that revised commencement dates for various phases of the project and authorized postponement of commencement of the final phase of Alewife Center from June, 1994, to September, 1997. Despite the special permit and the amendment thereto, Grace undertook no further construction at the locus following the completion of Alewife Center One. In 1996, Grace applied for further extensions of the phased commencement dates, but this time the application was denied by the planning board.

The locus is bounded to the north by a Residence B district;

to the east by Industry A-1, Residence B and OS (open space) districts; to the south by Industry A-1 and Residence C-2 districts; and to the west by Office 2 and OS districts.

In 1996, a petition by certain Cambridge residents led to adoption by the city council of a zoning amendment that rezoned as open space a 400-foot buffer area consisting of approximately thirteen acres that bordered on the adjacent Residence B districts. The new zone included all of the existing buildings and improvements on the locus, all of which became nonconforming uses. The planning board did not recommend adoption of the petition as filed, stating that "[d]ue to general planning concerns relating to the entire [d]istrict, the [p]lanning [b]oard will initiate a study leading to a comprehensive revision of the zoning regulations affecting all of the [Industry C] district and the coterminous [Planned Unit Development] . . . district for submission to the [c]ity [c]ouncil as expeditiously as possible."[4] Whether because of the planning board's position or otherwise, the version of the petition ultimately adopted by the city council provided for expiration six months after the date of enactment (thus remaining in effect from October 28, 1996, through April 28, 1997).

On January 6, 1997, Grace commenced the present action seeking a declaration that the 1996 amendment that created the temporary (six-month) open-space buffer zone was unlawful as spot zoning; constituted a taking under the United States and Massachusetts Constitutions; and violated the Zoning Act in that it bore no reasonable relationship to legitimate zoning purposes. On March 17, 1997, with the Grace lawsuit already pending, the city council adopted another amendment to the zoning ordinance, this time creating a temporary building moratorium applicable to the Industry C and Planned Unit Development districts that prohibited the issuance of all building permits therein until February 1, 1998. Following adoption of the temporary building moratorium, which affected all twenty-nine acres of the locus, Grace filed a motion to amend its complaint to allege that the moratorium (as well as the earlier

---

[4]The city also received an opinion from outside legal counsel that it is "likely" that the amendment would be found to be reverse spot zoning and that it "might" constitute a taking.

six-month rezoning of the thirteen-acre buffer strip) violated substantive due process and constituted both unlawful spot zoning and a regulatory taking. The motion to amend was allowed on June 19, 1997. On May 4, 1998, the city council extended the temporary building moratorium to September 30, 1998. Consequently, any intentions Grace might have had to develop the locus further were effectively held up from October 28, 1996, to September 30, 1998, a period of approximately twenty-three months.[5]

While these subsequent zoning changes were taking place, the city embarked on a rezoning study with respect to the Industry C district (and therefore the locus). On October 10, 1996, a proposed work program for the study was completed. Additional memoranda were prepared in November and December, 1996. In January, 1997, the city published a request for proposals for a professional facilitation team to work on the study. Early in 1997, a facilitation team was selected. In June, 1997, the planning board accepted a recommendation of the facilitation team that a working group be formed for the purpose of discussing major issues pertaining to the study. The working group consisted of approximately forty members, including representatives of Grace, neighborhood residents, planning board members and members of the Cambridge community development department. Between September, 1997, and January, 1998, the working group developed an issues agenda, retained consultants and negotiated procedures and approaches. The working group then met about every two weeks from January 27, 1998, to June 30, 1998.

On July 10, 1998, the facilitation team submitted to the planning board a report on the working group process. The working group did not reach consensus on what the rezoning should be; rather, it offered differing recommendations of competing participating groups. On December 15, 1998, two and one-half

[5]The twenty-three month period was comprised of the initial six-month zoning amendment creating the open space buffer zone from October 28, 1996, to April 28, 1997; the initial temporary building moratorium lasting to February 1, 1998; and the extension of the temporary building moratorium lasting to September 30, 1998. Grace's challenge to the entire temporary building moratorium was adequately asserted; a separate amendment regarding the extension of the moratorium was not required.

months after expiration of the extended temporary building moratorium, the planning board recommended to the city council the creation of a new Special District 3 to replace the existing Industry C district containing the locus. The new district, an amended version of a proposal filed previously by the planning board, significantly reduced, but did not eliminate, the amount of development previously permitted at the locus. On January 5, 1999, by letter to the city clerk, Grace informed the city council that it did not protest adoption of the planning board petition to create the Special District 3 on the condition that the planning board's amended version was accepted. The planning board petition as amended was adopted on January 7, 1999, and became Ordinance # 1212. Grace has not challenged the permanent zoning of the locus as part of Special District 3, confining this litigation to the merits of the zoning amendments applicable to the twenty-three month period that preceded adoption of Ordinance # 1212.

2. *Mootness.* The city argues that, with respect to Grace's assertions that the contested zoning amendments exceeded the police power and constituted reverse spot zoning, the claims are moot because those amendments expired not later than September 30, 1998. This proposition has some surface appeal. Whatever the validity of the challenged zoning amendments, their impact on Grace came to an end on September 30, 1998, when the extended temporary building moratorium expired. While Grace may have rights depending on whether those amendments constituted a regulatory taking, Grace is no longer directly affected by zoning that previously existed but is no longer in effect. See *Tra-Jo Corp.* v. *Town Clerk of Methuen,* 366 Mass. 846, 847 (1974).

However, there are countervailing considerations that convince us it is appropriate to decide each of Grace's claims. Possible mootness with respect to Grace's police power and spot zoning contentions will not eliminate the need to adjudicate the claim that the zoning amendments were a regulatory taking. Whether an "actual controversy" continues to exist with respect to the police power and spot zoning issues in the sense used for purposes of G. L. c. 231A, § 1, there is certainly a continuing controversy from a practical viewpoint between Grace and the

city, and between other owners and other municipalities, regarding the reach of the zoning power in similar circumstances. We have "on occasion answered questions in moot cases where the issue was one of public importance, where it was fully argued on both sides, where the question was certain, or at least very likely, to arise again in similar factual circumstances, and especially where appellate review could not be obtained before the recurring question would again be moot." *Lockhart* v. *Attorney Gen.*, 390 Mass. 780, 783 (1984). We reject the city's contention that delays by Grace rendered the issues moot; we discern no abnormal delays attributable to Grace. Likewise, we disagree with the city's claim that this is not a matter "capable of repetition, yet evading review." *Ibid.*, quoting from *Wolf* v. *Commissioner of Pub. Welfare*, 367 Mass. 293, 298 n.7 (1975). It is likely that private property rights in conflict with governmental authority will continue to create controversy over the use of temporary moratoria or interim zoning, and that treatment of the issues involved may be helpful.[6]

3. *Police power/spot zoning.* Grace levels separate attacks on the amendments as exceeding the city's police power and as constituting unlawful "reverse" spot zoning. In his decision on summary judgment, the Land Court judge adopted Grace's analytical approach to the extent that he dealt with these challenges individually and independently of each other. We view Grace's police power and spot zoning arguments as raising essentially a single issue, i.e., whether the amendments were a legitimate exercise of the city's authority under the Zoning Act. If the city's position is sustained on that issue, it follows that the amendments do not constitute spot zoning.

Grace argues that the Land Court judge viewed the amendments as properly within the city's authority because he found that they were intended only to be interim zoning for the purpose of preserving the status quo during a study anticipating permanent zoning changes. Grace asserts that such a conclusion was improper given the evidence that, at a minimum, was in conflict with respect to the purpose of the amendments, and

---

[6]Given our disposition, it is unnecessary to address Grace's contention that G. L. c. 240, § 14A, authorizes this action even if an "actual controversy" does not exist.

thus could not justify a summary judgment on the issue. To the extent the judge relied on an apparent planning process implemented by a facilitation team and a working group, Grace's argument continues, that process was a sham designed to disguise the fact that the city had already decided to stunt Grace's development prospects well before the "interim" zoning was adopted. Finally, Grace contends that, even if the amendments were genuine interim zoning, the judge misapplied Massachusetts law on the subject and failed to examine whether the interim amendments were reasonable responses to specific planning concerns.

With respect to the exercise of their powers under the Zoning Act, we accord municipalities deference as to their legislative choices and their exercise of discretion regarding zoning orders. Apart from limitations not relevant here, the Zoning Act generally permits cities and towns to adopt any zoning provisions which are constitutionally permissible. See *Sturges* v. *Chilmark*, 380 Mass. 246, 253 (1980). The constitutional test is whether the by-law is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Id.* at 256, quoting from *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365, 395 (1926). Due process challenges to government action affecting economic activity call for an inquiry "whether the challenged measure bears a rational relation to any permissible public object which the legislative body 'may plausibly be said to have been pursuing.' " *Sturges, supra* at 256, quoting from *Blue Hills Cemetery, Inc.* v. *Board of Registration in Embalming & Funeral Directing*, 379 Mass. 368, 372 (1979). Zoning authority "rests for its justification on the police power, and that power is to be asserted only if the public health, the public safety and the public welfare, as those terms are fairly broadly construed, will be thereby promoted and protected. A zoning by-law will be sustained unless it is shown that there is no substantial relation between it and the furtherance of any of the general objects just mentioned." *Caires* v. *Building Commr. of Hingham*, 323 Mass. 589, 593 (1949). Every presumption is made in favor of the by-law, and, if its reasonableness is fairly debatable, it will be sustained. *Id.* at 594-595. Enforcement of the ordinance will not be refused un-

less there is a showing beyond a reasonable doubt that the measure is in conflict with the Constitution or the enabling statute. *Collura* v. *Arlington*, 367 Mass. 881, 885 (1975). Those opposing the zoning enactment "have the heavy burden of showing a conflict with applicable constitutional provisions." *Sturges* v. *Chilmark, supra* at 256.

The broad authority vested in municipalities to zone for public purposes has been held to justify the imposition of reasonable time limits on development. "The weight of authority is that reasonable interim zoning provisions may be enacted within the scope of a general zoning enabling act, without reliance on specific statutory authorization for interim ordinances." *Collura, supra* at 886. Interim provisions can be a "salutary device in the process of plotting a comprehensive zoning plan to be employed to prevent disruption of the ultimate plan itself." *Ibid.* (two years not an unreasonable period for the town to complete a thorough review of its comprehensive plan). Whatever doubts may have existed at one time about the validity of a compulsory pause in development to give the community an opportunity to decide what is in its best interest have now been resolved. The desirability of thoughtful consideration before a municipality reconciles the variety of competing interests that affect any zoning change constitutes the rational reason that justifies a temporary halt to private activities.

The judge correctly concluded that the particular zoning amendments at issue were permissible interim zoning. The burden was on the city to make a prima facie showing of a rational reason for its action. See *Sturges* v. *Chilmark, supra* at 259. Planning board documents demonstrated that the city was engaged in an effort to decide upon the appropriate level of industrial and commercial activity taking place near a residential area, and to plan for non-business space that would separate these incompatible zones. There was no evidence supporting Grace's contention that the planning process was not genuine because the decision regarding permanent zoning had already been made.

Whether the working group was or was not effective is not the issue. "[A] municipality may impose reasonable time limitations on development, at least where those restrictions are

temporary and adopted to provide controlled development while the municipality engages in comprehensive planning studies." *Sturges, supra* at 252-253. It is not disputed that in 1996 the planning board announced that it would conduct a study to determine how the zoning of the district in which the locus was situated should be revised. This led to the creation of a work program for the project; the hiring of a professional facilitation team; the formation and meetings of the working group; the retaining of consultants; and a report to the planning board.

The fact that the members of the working group failed to agree on a result is not surprising, given the differing viewpoints represented, and is not determinative that the process was carried on in bad faith. The decision regarding sensible zoning is for the planning board to recommend and for the city council to make. Considered views on the subject, even if in conflict, are plainly helpful to both. That the ultimate disposition was consistent with the objectives of the "anti-Grace" neighborhood representatives is not evidence of predetermination. The validity of the zoning amendments does not turn on the motives of their supporters. See *Turnpike Realty Co.* v. *Dedham*, 362 Mass. 221, 226 (1972), cert. denied, 409 U.S. 1108 (1973). See also *Caires* v. *Building Commr. of Hingham, supra* at 595-596. Much legislation, indeed much government activity, comes about because of initiatives by persons with interests in the outcome. Nothing in the record suggests that the municipal authorities "were acting solely in behalf of [the neighborhood petitioners] rather than in the best interests of the [city] as they thought, and there is nothing in the slightest degree that affects the integrity of their vote." *Id.* at 596.

We fail to understand Grace's characterization of the zoning amendments as not being "reasonable responses to specific planning concerns." That there was a dispute among various interested parties regarding the future of this section of Cambridge and the effect on that future of possible development plans of Grace was obvious. That the city sought time in which to ponder what might be the best resolution of the conflicting views was understandable. Memorialization of all of the factors that might bear on the city's ultimate decision was not required. The city "was not obliged to conduct the study before adopting

a temporary measure to protect the public interest." *Sturges* v. *Chilmark, supra* at 260. Nothing in the Massachusetts cases invites a determination that the city's reasons for declaring a moratorium on development to enable study, reflection and decision on a subject matter of this complexity were inadequate. We conclude, therefore, that the challenged zoning amendments were within the lawful ambit of the Zoning Act and that they did not exceed the city's authority under the police power.

The above analysis disposes of Grace's challenge to the zoning amendments as reverse spot zoning, and therefore unlawful as a denial of equal protection under the United States and Massachusetts Constitutions, and as a violation of the public welfare purposes of G. L. c. 40A, the Zoning Act. See *Board of Appeals of Hanover* v. *Housing Appeals Comm. in the Dept. of Community Affairs*, 363 Mass. 339, 362 n.15 (1973). Spot zoning occurs "where one lot or a small area has been singled out for treatment less onerous than that imposed upon nearby, indistinguishable properties." Bobrowski, Massachusetts Land Use and Planning Law § 3.4.3 (1993). Amendments that impose more restrictive treatment on given parcels than is imposed on other parcels in the same zoning district are often characterized as "reverse spot zoning." *Ibid.* However, the legality of a given zoning amendment turns not on what parcel has been singled out, or even on the effect on the parcel, but rather on whether the change can fairly be said to be in furtherance of the purposes of the Zoning Act. See *Lamarre* v. *Commissioner of Pub. Works of Fall River*, 324 Mass. 542, 546-547 (1949). Given that Grace has failed to demonstrate that the zoning amendments at issue exceeded the city's authority under the police power, Grace's case on the issue of reverse spot zoning fails as well.

It is unlawful to invoke the zoning power solely to confer an economic benefit (or impose an economic detriment) upon the owner of a comparatively small area within a zoning district when the remaining parcels of that district are treated differently. See *Lanner* v. *Board of Appeal of Tewksbury*, 348 Mass. 220, 228 (1964). Where a rezoned area is not "sufficiently differentiated" from other surrounding land to support a change in the established classification, that rezoning is a violation. *Shapiro* v. *Cambridge*, 340 Mass. 652, 656 (1960) (parcel rezoned from

heavy industry district to light industry district to prevent use as building wrecking business and junk yard). The setting off of a parcel from similar adjacent business lots in order to prevent a proposed business use violates the principle of uniformity. See *Schertzer* v. *Somerville,* 345 Mass. 747, 752 (1963). See also *Mastriani* v. *Building Inspector of Monson,* 19 Mass. App. Ct. 989, 991 (1985) (rezoning of twenty-acre parcel indistinguishable from surrounding land); *National Amusements, Inc.* v. *Boston,* 29 Mass. App. Ct. 305, 308, 312-313 (1990) (singling out of specific parcel for disparate treatment in order to protect residential and local business district from unwanted large scale commercial development). "The vice is the singling out of a particular parcel for different treatment from that of the surrounding area, producing, without rational planning objectives, zoning classifications that fail to treat like properties in a uniform manner." *Id.* at 312.

Underlying these principles is the requirement that zoning differentiations be adopted in the service of some defensible public interest, not merely to benefit or harm a particular parcel. "What counts is whether the purposes of the amendment are consonant with the objectives of the [zoning] enabling act." *Fabiano* v. *Boston,* 49 Mass. App. Ct. 281, 286 (2000). Spot zoning does not occur unless it is shown that a parcel has been singled out from similar surrounding parcels "all for the economic benefit[7] of the owner of that lot." *Lamarre* v. *Commissioner of Pub. Works of Fall River, supra* at 545, quoting from *Marblehead* v. *Rosenthal,* 316 Mass. 124, 126 (1944). See *Leahy* v. *Inspector of Bldgs. of New Bedford,* 308 Mass. 128, 132-134 (1941) (single lot in residential area zoned for business purposes solely to benefit owner). Once it is established, as it has been here, that the amendments have a substantive relationship to the promotion of the public welfare, the amendments are not, by definition, spot zoning, irrespective of the subjective purposes of the sponsors.

In concluding that the temporary halt in development brought

---

[7]The principle obviously applies equally to actions that single out indistinguishable parcels for treatment detrimental to the owner. See *Schertzer* v. *Somerville,* 345 Mass. 747, 752 (1963); *National Amusements, Inc.* v. *Boston,* 29 Mass. App. Ct. 305, 308, 312-313 (1990).

about by the zoning amendments was a valid imposition of a period for study and reflection that was within the city's police power, and was therefore not unlawful spot zoning, the judge applied appropriate criteria. He properly considered the absence of evidence that the neighborhood had not changed; the relatively large size of the area affected (compared with the smaller parcels that more frequently are found to be the subjects of spot zoning); whether there was a permissible effect on the municipality; and whether the locus was treated in a way that was different from the treatment of similar surrounding properties. He considered as well the additional factors that the locus bordered three residential districts (spot zoning being less likely at the borders of districts, see *Coleman* v. *Board of Selectmen of Andover*, 351 Mass. 546, 549 [1967]), and the possibility of economic harm to Grace as arguably the real reason why the moratorium was adopted. The judge correctly recognized that no single factor was determinative, and that the factors he enumerated were not necessarily the only ones that might be applicable in a zoning analysis. His application of relevant factors correctly led to his conclusion that the zoning amendments were substantially related to a permissible public objective, and therefore within the police power.[8]

It was not error to decide by means of a summary judgment the question of the city's authority to adopt the amendments. In the event of a trial, Grace would have had a "heavy burden" of proving "facts which compel a conclusion that the question whether the amendment falls within the enabling statute is not

---

[8]Grace attacks the judge's reliance on certain factors gleaned from the cases by Professor Bobrowski, see Bobrowski, Massachusetts Land Use and Planning Law § 3.4.3 (1993), as guides by which to determine whether spot zoning has occurred in a particular instance. Grace urges adoption of factors set forth in *Murphy* v. *Springfield*, 25 Mass. App. Ct. 1121 (1988), an order of this court pursuant to our Rule 1:28 that affirmed a judgment of the Land Court. There is considerable overlap; indeed, the respective factors may be merely different ways of articulating the same considerations. We are not convinced that formulation of a rigid list of factors is a useful exercise. The Legislature has not seen fit to do so, leaving the courts to apply the general principles embodied in the Zoning Act. Nor have the cases created formal requirements. Rather, these cases by their nature require some flexibility, obviously on the condition that the elements on which the judge relies shall be meaningful in deciding whether the zoning ordinance or by-law has a substantial relationship to a permissible public purpose.

even fairly debatable." *Crall* v. *Leominster,* 362 Mass. 95, 103 (1972). See *Mastriani* v. *Building Inspector of Monson,* 19 Mass. App. Ct. at 991. Grace would have had to demonstrate there was *no* substantial relation between the temporary building moratorium and the purposes of G. L. c. 40A. See *Schertzer* v. *Somerville,* 345 Mass. at 751. Conflict with the Zoning Act would have had to be shown beyond a reasonable doubt. *Lanner* v. *Board of Appeal of Tewksbury,* 348 Mass. at 228. For the reasons set forth, this burden could not have been sustained. On the summary judgment record, the judge properly concluded that Grace had no reasonable expectation of proving the essential elements of its case. See *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 716 (1991).

4. *Regulatory taking.* Finally, Grace contends that, even if the zoning amendments were lawful from a zoning viewpoint, they constituted a partial regulatory taking for which Grace is constitutionally entitled to compensation. In this regard, Grace asserts that the Land Court judge misapplied the criteria that are applicable to the question whether a regulatory taking has occurred; and argues that, in any event, the judge could not permissibly enter summary judgment because disputed questions of material fact required a trial. We conclude that the judge correctly applied the standards in determining that there had not been a regulatory taking, and that the evidence produced by Grace did not provide support for a contrary determination.[9]

Compensation is required by the Fifth Amendment to the United States Constitution when governmental regulation deprives the owner of "all economically beneficial or productive use of land." See *Lucas* v. *South Carolina Coastal Council,* 505 U.S. 1003, 1014-1019 (1992). A moratorium that deprives the owner of value for a temporary period is not per se a taking because the deprivation is not permanent. See *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency,* 535 U.S. 302 (2002) (prohibition lasting thirty-two months).

---

[9]We deem the issue ripe for adjudication. The challenged zoning amendments on their face permitted no development at all during an interim period. Accordingly, there could be no administrative action that had to be exhausted before a court proceeding was appropriate. Compare *Daddario* v. *Cape Cod Commn.,* 425 Mass. 411, 414-415, cert. denied, 522 U.S. 1036 (1997).

Grace itself characterizes the zoning amendments as a *partial* regulatory taking, thus acknowledging that the value of the property has not been eliminated in its entirety.

"When a regulatory taking involves neither a physical invasion nor a complete deprivation of use, as in the case here, Federal law has established several interrelated factors which are to be considered in determining whether a compensable taking has occurred: '(1) the economic impact of the regulation on the claimant' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations' and (3) 'the character of the governmental action.' " *Leonard* v. *Brimfield*, 423 Mass. 152, 154, cert. denied, 519 U.S. 1028 (1996), quoting from *Connolly* v. *Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986).[10] Despite the use of these criteria for an appreciable period, see, e.g., *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 124 (1978), the considerations defined in this fashion invite idiosyncratic decision making. We attempt an objective application of them to the interim zoning challenged here.

It was Grace's burden to make sufficient showings under the three interrelated standards to require a trial. It did not do so. It is not sufficient that there be an economic impact of some kind as a result of the challenged amendments. All governmental regulation of business has an economic impact of some kind, and the formulation by the Supreme Court of the "economic factor" must contemplate more than that. In addition, for there to be a taking, the owner must satisfy the burden of showing that there has been a negative economic impact as a direct consequence of the government's action, rather than as a product of the owner's own activities or decisions.

Here, it was not disputed that Grace continued to realize a return on its investment in Alewife One, and continued to use the various production, research and development facilities that were located on the property. These uses continued throughout the interim period. In addition, while the hiatus in Grace's development plans came about in part because of the zoning amendments, it was attributable principally to Grace's choice,

---

[10]The criteria presuppose that the regulation is valid as applied to the locus, a conclusion that we have reached in section 3 of this opinion.

presumably made in its economic self-interest, to forgo development that it had been authorized to undertake between 1989 and 1996. Thus, Grace continued to use the locus as it had been used previously, and then experienced a twenty-three month prolongation of an extended delay in development that Grace itself had voluntarily assumed for a period of approximately seven years. It is not impermissible that governmental action precludes the most beneficial use of given property. See *Leonard* v. *Brimfield, supra* at 156, citing *Penn Cent. Transp. Co.* v. *New York City, supra* at 125. That these effects took place during a moratorium period preceding permanent zoning, and thus were temporary only, lends further support to the conclusion that the economic impact on Grace in this case did not transform permissible regulation into a compensable taking.

Similar considerations lead us to conclude that Grace has not presented the kind of evidence that would justify a finding that the zoning amendments interfered with the company's investment-backed expectations to an unreasonable extent. "A property owner's investment-backed expectations must be reasonable and predicated on existing conditions." *Leonard* v. *Brimfield, supra* at 155. Grace was plainly entitled to expect that it could continue the beneficial uses of the property that preceded the challenged amendments, and it was permitted to do so. That future plans may have been frustrated by an otherwise valid zoning change does not, in these circumstances, constitute interference with reasonable investment-backed expectations. A property owner cannot reasonably rely on an assumption that zoning will forever remain the same, and that the government will refrain indefinitely from valid changes in zoning to enhance the public interest (including interim periods of cessation in development in order to prepare for such changes). Simply stated, a developer with designs on improving its property consistent with an existing zoning framework had best get its shovel into the ground. That the zoning change prevents the owner from exploiting the investment potential of the property to the fullest does not make it a taking. See *Daddario* v. *Cape Cod Commn.*, 425 Mass. 411, 417-418, cert. denied, 522 U.S. 1036 (1997).

An examination of the "character" of the governmental action yields the same result. There was no physical invasion of the property. See *Leonard* v. *Brimfield, supra* at 156. Likewise, the owner has not been deprived of all beneficial use. Grace offered evidence that there was a substantial diminution in the value of the locus as a result of the zoning amendments. Even if true, that, by itself, does not create a right of compensation. See *Turnpike Realty Co.* v. *Dedham*, 362 Mass. at 236-237. Following completion of the moratorium, Grace retained title to the locus; maintained the right to use the existing improvements; and acquired opportunities pursuant to the new permanent zoning to develop the property further, albeit not to the extent potentially available under the previous ordinance. The manner in which the government affected Grace by means of the moratorium was not that kind of action that constitutionally compels compensation.

5. *Disposition.* We of course limit our analysis to the twenty-three month period covered by the challenged zoning amendments. For the reasons stated, we conclude that Grace did not satisfy its burden to produce evidence sufficient to warrant a finding that the zoning amendments that brought about the moratorium period were in excess of the city's police power or constituted a compensable taking. Accordingly, we affirm the judgment of the Land Court.

*Judgment affirmed.*