AMERICAN FAMILY LIFE ASSURANCE COMPANY *vs.*
COMMISSIONER OF INSURANCE
(and a companion case[1]).

Suffolk. December 9, 1982. — March 15, 1983.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Statute,* Construction. *Insurance,* Health and accident, Regulation. *Administrative Law,* Regulations, Adjudicatory proceeding, Judicial review. *Due Process of Law,* Insurance regulation, Adjudicatory proceeding.

Under G. L. c. 175, § 110E, the Commissioner of Insurance was not limited to establishing minimum standards of full and fair disclosure, but was empowered to make regulations concerning the content of insurance policies, consistent with the listed statutory goals, unrelated to disclosure. [471-475]

Regulations promulgated by the Commissioner of Insurance banning the sale of individual health insurance policies covering only one or a few diseases unless they covered twelve listed diseases and met certain other requirements were not arbitrary or capricious on their face, absent evidence establishing that the regulations lacked any conceivable basis on which the Commissioner could have relied, where the regulations were rationally related to the statutory goal of eliminating abuses in the sale of health insurance. [475-480]

General Laws c. 175, § 110E, which establishes a procedure for preventive rule making, did not require the Commissioner of Insurance to hold an adjudicatory hearing before withdrawing approval of future sales to new purchasers of an insurance company's previously approved cancer-risk insurance policies on the ground of noncompliance with newly promulgated regulations. [480-482]

CIVIL ACTIONS commenced in the Superior Court Department on October 15, 1979, and March 27, 1980, respectively.

---

[1] Union Fidelity Life Insurance Company *vs.* Commissioner of Insurance.

The cases were heard by *McCann*, J., a District Court judge sitting under statutory authority.

The Supreme Judicial Court granted a request for direct appellate review.

*Stephen S. Ostrach*, Assistant Attorney General (*Thomas A. Barnico*, Assistant Attorney General, with him) for the defendant.

*Joel Z. Eigerman* (*Edward J. McCormack, III*, with him) for Union Fidelity Life Insurance Company.

*Sanford A. Kowal* (*Emanuel Howard* with him) for American Family Life Assurance Company.

HENNESSEY, C.J. The defendant, the Commissioner of Insurance (Commissioner), appeals from two Superior Court judgments invalidating regulations promulgated by the Commissioner. The regulations, codified at 211 Code Mass. Regs. 47.07 (1) (a)-(e) and 47.09 (4) (a)-(c) (1980), effectively banned the sale of individual health insurance policies covering only one or a few diseases (specified disease insurance), unless they covered twelve listed diseases and met certain other requirements. The regulations were intended to curb abuses relating to the sale of cancer-risk insurance, which the Commissioner found was a poor health care investment, and was being marketed in an unscrupulous manner. The plaintiffs, American Family Life Assurance Company (American), and Union Fidelity Life Insurance Company (Union), had been selling cancer-risk insurance. They challenged the validity of the regulations in the Superior Court pursuant to G. L. c. 30A, § 7, and G. L. c. 231A, § 2. The cases were consolidated for trial. A judge in the Superior Court concluded that the Commissioner lacked statutory authority to promulgate the regulations, and that portions of the regulations were arbitrary and capricious. Judgments were entered accordingly. The case is before us on direct appellate review. We reverse.

The judge found the following facts. Under prior regulations, American and Union had been selling cancer-risk insurance policies which had been approved by the Commissioner pursuant to standard procedures for the approval of

insurance policies under G. L. c. 175, § 108. In 1979, the Commissioner promulgated a regulation entitled "Rules and Regulations Governing Individual Accident and Sickness Insurance," later codified as 211 Code Mass. Regs. 47.00 (1980).[2] The regulations dealt with a variety of matters, but the provisions at issue here are those governing the sale of specified disease insurance. In brief, they established five requirements: Under 47.07 (1) (a), specified disease insurance has a maximum benefit limit of no less than $10,000 and covers all twelve specified conditions (one of which is cancer); under 47.07 (1) (b), internal limits on dollar benefits can be no less than certain designated amounts; under 47.07 (1) (c), specified disease coverage shall be guaranteed renewable to age sixty-five and may not be sold to anyone over that age; under 47.07 (1) (d), it may be sold only as a supplement to basic hospital insurance; and under 47.09 (4) (a)-(c), rates charged must meet specified minimum loss ratios.

The regulations apply to "all individual . . . sickness insurance policies . . . filed with the Division of Insurance, delivered, or issued for delivery after the effective dates of this regulation . . . . No policy . . . covered by this regulation shall be issued or issued for delivery unless it complies with this regulation." 211 Code Mass. Regs. 47.02 (1980). The regulations were to be effective upon publication, which occurred on September 27, 1979. The Commissioner does not contend that the regulations apply to policies which were issued before that date. However, because there is no saving clause in the regulations, the Commissioner has deemed the regulations to apply to new sales of previously approved specified disease policies. Thus, under the regulations, American's and Union's previously approved cancer-risk insurance policies cannot be issued to new purchasers.

---

[2] The judge found that all parties agreed that these regulations were developed through a rule making proceeding.

The judge concluded that regulations 47.07 (1) (a)-(e) and 47.09 (4) (a)-(c) exceeded the Commissioner's statutory authority. The judge discussed the statutes relied on to support the Commissioner's authority to promulgate the regulations, and concluded that the only possible basis was G. L. c. 175, § 110E.[3] Furthermore, even assuming that the Commissioner had authority to promulgate the regulations, the judge concluded that regulations 47.07 (1) (a) and (d) were arbitrary and capricious, because they had no rational relation to the goals of § 110E. Finally, the judge concluded that the Commissioner could not withdraw his approval of previously approved policies for noncompliance with the new regulations without first affording the affected insurers an adjudicatory hearing.

We are presented with three questions on this appeal. First, did the Commissioner have statutory authority to promulgate regulations 47.07 (1) (a)-(e) and 47.09 (4) (a)-(c) under G. L. c. 175, § 110E?[4] Second, were regulations 47.07 (1) (a) and (d) arbitrary and capricious? Third, was the Commissioner required by statute or by constitutional due process to hold an adjudicatory hearing before withdrawing approval of a previously approved policy under G. L. c. 175, § 110E?

1. We first consider the scope of the Commissioner's authority under G. L. c. 175, § 110E, inserted by St. 1973, c. 1081. It provides in relevant part: "The commissioner shall make rules and regulations . . . to establish minimum standards of full and fair disclosure, for the form and content of policies of accident and sickness insurance . . . . Such rules and regulations may apply to all, any portion or reasonable classifications of such policies or contracts, and shall be made to bring about: (a) reasonable standardization and simplification of coverages to facilitate understanding and

---

[3] The regulations state that they are promulgated under the authority of G. L. c. 175, §§ 2B, 108, 110E; c. 176, § 26; c. 176A; c. 176B; and c. 176E.

[4] Because, as will be seen, we discern sufficient authority of the Commissioner in § 110E, we need not look to other possible statutory bases.

comparisons; (b) elimination of provisions which may be misleading or unreasonably confusing, in connection either with the purchase of such insurance or with the settlement of claims; (c) elimination of deceptive practices in connection with the sale of such insurance; (d) elimination of provisions which may be contrary to the health care needs of the public; (e) elimination of coverages which are so limited in scope as to be of no substantial economic value to the holders thereof."

The plaintiffs argue that the phrase "full and fair disclosure, for the form and content of policies," limits the Commissioner's authority to the issuance of regulations aimed at ensuring full and fair disclosure. They rely chiefly on the use of the word "for," and on the legislative history of § 110E. The judge in the Superior Court agreed that "[u]nder a literal reading of the statute," the Commissioner's power under § 110E was limited to establishing minimum standards of full and fair disclosure. The objectives (a) through (e) were subordinate to this dominant purpose. The judge found that the legislative history of § 110E supported this interpretation. Accordingly, he held that the challenged regulations exceeded the Commissioner's authority because they governed substantive provisions of accident policies unrelated to standards of disclosure, such as the risks to be insured against, the minimum benefits to be provided and the length of time during which said benefits must be available.

Section 110E was inserted by St. 1973, c. 1081. In the 1973 legislative session the Division of Insurance recommended the passage of House Bill No. 109 which would have amended G. L. c. 175, § 108, by adding a new final paragraph providing in part that "[t]he Commissioner may also by regulation establish minimum benefits for accident or sickness policies . . . so as to prevent the sale of policies that he finds are not of substantial economic value to the policyholder." Later in the same session, House Bill No. 7319 was introduced. It empowered the Commissioner to "make . . . reasonable rules and regulations, . . . including standards of full and fair disclosure, for the form and con-

tent of policies of accident and sickness insurance." This bill was amended by Senate Doc. No. 1903, which substituted the present language of this portion of § 110E, authorizing the Commissioner to make "regulations . . . to establish minimum standards of full and fair disclosure, for the form and content of policies." The plaintiffs contend that the changes in language from these prior bills to § 110E as enacted reveal a legislative intent to limit the Commissioner's authority to the promulgation of regulations governing disclosure.

Although the plaintiffs' interpretation of this portion of the statute is not unreasonable, the Commissioner advances an alternative view. He suggests that since the words "for the form and content of policies" are separated from the words "to establish minimum standards of full and fair disclosure" by a comma, each phrase "was intended to be a parallel and independent source of regulatory authority." Thus, the Commissioner is empowered to make regulations concerning the content of insurance policies, consistent with the listed statutory goals, unrelated to disclosure.

We agree with the Commissioner's interpretation, primarily because the plaintiffs' construction is at odds with a workable reading of the entire statute. "Where the draftsmanship of a statute is faulty or lacks precision, it is our duty to give the statute a reasonable construction." *School Comm. of Greenfield* v. *Greenfield Educ. Ass'n*, 385 Mass. 70, 79-80 (1982). *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 190 (1976). *Massachusetts Turnpike Auth.*, v. *Commonwealth*, 347 Mass. 524, 528 (1968). We will not construe the statutory language so that it is inconsistent with other portions of § 110E when the language can fairly be interpreted to lead to a logical and consistent result. *Lexington* v. *Bedford*, 378 Mass. 562, 570 (1979). See *Boston* v. *Massachusetts Bay Transp. Auth.*, 373 Mass. 819, 823 (1977). Section 110E authorizes regulation of the content of policies to achieve the elimination of provisions which are contrary to the health care needs of the public and the elimination

of coverages so limited in scope as to be of no substantial economic value. G. L. c. 175, § 110E (d), (e). It is unlikely that the Legislature considered it could eliminate undesirable provisions and coverages by regulating disclosure. Such regulations at best might indirectly help to achieve these goals in the long run. We conclude that the specific statutory mandate in § 110E for elimination of coverages and provisions, indicates a legislative intent to empower the Commissioner to make regulations to effectuate these goals directly. Cf. *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 148 (1982) (public policy of Commonwealth, one source of which is G. L. c. 175, § 110E, is that insurance contracts may not be misleading, and that coverages may not be unrealistically limited or so limited in scope as to be of no substantial economic value).

The Commissioner notes that the act which created § 110E, St. 1973, c. 1081, was entitled, "An Act further regulating the contents of accident and sickness policies and regulating advertising of such policies." The title speaks of regulation of the content of policies, but does not mention disclosure. It is well established that, although the title of an act cannot control the plain provisions of the act, it may aid construction of ambiguous clauses. *Breault* v. *Ford Motor Co.*, 364 Mass. 352, 353-354 n.2 (1973). *Commonwealth* v. *Jarrett*, 359 Mass. 491, 495 n.5 (1971). *Massachusetts Soc'y for the Prevention of Cruelty to Animals* v. *Commissioner of Pub. Health*, 339 Mass. 216, 223 (1959). Similarly, the Governor's message which accompanied enactment of St. 1973, c. 1081, declared: "It is essential that the provisions of this Act take effect forthwith in order that the Commissioner of Insurance may immediately make regulations concerning the advertising *and content* of accident and sickness insurance policies" (emphasis supplied). St. 1973, c. 1081, at 1142-1143.

Moreover, the Commissioner's contemporaneous, long-continued construction of § 110E supports our interpretation. "The interpretation of the Commissioner is not binding on us, but it is entitled to some weight . . . and the consistent

administrative construction of a statute permitting more than one possible interpretation is of added significance" (citations omitted). *Metropolitan Property & Liab. Ins. Co.* v. *Commissioner of Ins.*, 382 Mass. 514, 523 (1981). See *Lowell Gas Co.* v. *Commissioner of Corps. & Taxation*, 377 Mass. 255, 262 (1979); *Casa Loma, Inc.*, v. *Alcoholic Beverages Control Comm'n*, 377 Mass. 231, 235 (1979); *Maryland Casualty Co.* v. *Commissioner of Ins.*, 372 Mass. 554, 563 (1977); *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 343 (1964). Regulations are good indicators of an agency's interpretation of a statute it is charged with administering. In 1974, shortly after § 110E was enacted, the Commissioner promulgated regulations which were subsequently codified at 211 Code Mass. Regs. 42 (1978). These were the predecessor regulations to the regulations now codified at 211 Code Mass. Regs. 47 (1980), at issue in this case. They allowed insurers to issue policies which covered only one disease, but required, inter alia, that such policies have a maximum benefit level of no less than $10,000, meet specified internal limits on dollar benefits, and be noncancellable for life without right to raise the premium rate. 211 Code Mass. Regs. 42.12, 42.05 (19) & (20) (1978). These regulations established coverages for individual sickness insurance policies. They reveal that from the time § 110E was enacted, the Commissioner considered that the statute authorized him to make such regulations. The challenged regulations are consistent with the Commissioner's contemporaneous interpretation as indicated by the 1974 regulations.

We conclude that § 110E empowered the Commissioner to regulate the content of insurance policies to achieve the listed goals. Regulations 47.07 (1) (a)-(d) and 47.09 (4) (a)-(c) (1980) were accordingly within the Commissioner's statutory authority.

2. The judge found that regulations 47.07 (1) (a) and (d) were arbitrary and capricious. The judge considered the relationship between the regulations and § 110E (*d*) and (*e*). He focused on the twelve-disease requirement of 47.07

(1) (a), and concluded on the basis of the evidence at trial that there was no rational basis for the twelve-disease classification from the standpoint of economic value, health care, the catastrophic illness test, frequency of occurrence, medical cost or severity. Similarly, he concluded that the supplement requirement of regulation 47.07 (1) (d) was arbitrary, capricious, and unreasonable.

As a threshold matter, we note that there appears to be some confusion among the parties as to the difference between a challenge to a regulation in practice and on its face, and the proper standard of our review of the Superior Court judgment. The plaintiffs argue that because they produced evidence at trial, they attacked regulations 47.07 (1) (a) and (d) as arbitrary and capricious in practice, and we should review the judge's decision under the "clearly erroneous" standard. If the regulations exceeded the Commissioner's statutory authority, then they would be arbitrary and capricious on their face in that they would by definition be unrelated to the achievement of any statutory goals. Here the judge found that, even assuming the Commissioner was empowered to promulgate the regulations, they were not rationally related to the goals of § 110E. His conclusion was certainly based on evidence the plaintiffs produced at trial. However, this was still an analysis of the facial validity of regulations 47.07 (1) (a) and (d). The plaintiffs' evidence tended to show that specified disease insurance is useful and economical for some individuals, and that the twelve-disease requirement of regulation 47.07 (1) (a) is not a rational grouping based on economic value, health care value, the catastrophic illness test, frequency of occurrence, medical severity and medical cost. In particular, the plaintiffs argued that the Commissioner's reliance on the Blue Cross-Blue Shield Prolonged Illness Certificate (PIC), to develop the twelve-disease list, had no real validity. All of these arguments go to the question whether regulation 47.07 (1) (a) itself is arbitrary and capricious. It is, therefore, clear that the plaintiffs challenged, and still challenge,

the facial validity of the regulations.[5] The fact that the judge's conclusion on the relation of the regulations to the statutory goals was based on trial testimony, rather than statutory analysis, does not change the fact that he was deciding a challenge to the rationality of the regulations themselves, not a challenge based on their effects in operation.

We have concluded that § 110E empowered the Commissioner to regulate the content of policies to achieve the listed statutory goals. Under well established principles, if regulations 47.07 (1) (a) and (d) are rationally related to these statutory goals, they will be upheld. "We accord to a regulation . . . the same deference we extend to a statute." *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n*, 387 Mass. 122, 127 (1982), citing *Greenleaf Fin. Co. v. Small Loans Regulatory Bd.*, 377 Mass. 282, 293-294 (1979). *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 768 (1980). "Thus, we must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977). *Purity Supreme, Inc.* v. *Attorney Gen., supra* at 775. We will not substitute our judgment as to the need for a regulation, or the propriety of the means chosen to implement the statutory goals, for that of the agency, so long as the regulation is rationally related to those goals. "It is not our function to consider the expediency of an enactment or the wisdom of its provisions." *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 544 (1974). Accordingly, a statute or a regulation is not invalid "merely because the evidence of record suggests that the 'ultimate efficacy' of achieving the

---

[5] The plaintiffs' only claim that regulation 47.07 (1) (a) was illegal in practice was based on the disapproval of a chemotherapy rider submitted by the Physicians Mutual Insurance Co., which is not a party to this action. The plaintiffs lack standing to raise this issue. In any event, if the disapproval was illegal, the remedy would be to order approval of the rider, not to invalidate the regulation. See *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n*, 387 Mass. 122, 135 (1982).

statutory purpose is in question, or that the means to achieve the statutory end is rough, illogical or not the best available . . . ." *Shell Oil Co.* v. *Revere*, 383 Mass. 682, 687 (1981). Rather, a plaintiff challenging a regulation as arbitrary and capricious bears the heavy burden of "proving on the record 'the absence of any conceivable ground upon which [the rule] may be upheld.'" *Purity Supreme, Inc.* v. *Attorney Gen.*, *supra* at 776, quoting *Colella* v. *State Racing Comm'n*, 360 Mass. 152, 156 (1971). *Commonwealth* v. *Henry's Drywall Co.*, *supra* at 542. *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 138 (1949). See *Shell Oil Co.* v. *Revere*, *supra* at 688 (if question is at least debatable or arguable, legislation will be upheld).

Applying these principles to the instant case, we conclude that the plaintiffs did not carry their burden. The Commissioner's opinion indicates that the twelve-disease requirement of regulation 47.07 (1) (a) was intended to curb abuses in the sale of cancer-risk insurance, including sales tactics exploiting public fear of the disease, and poor health care value. There was ample testimony before the Commissioner documenting these abuses. The Commissioner might well have determined that these abuses would be likely to occur in the sale of any specified disease insurance policy. It was, therefore, rational for him to take steps to eliminate the sale of insurance policies covering only one or a few diseases. Similarly, in light of evidence establishing the poor health care value of specified disease insurance, it was reasonable for him to prohibit the sale of such policies alone, by requiring in regulation 47.07 (1) (d) that they be sold only as a supplement to basic hospital insurance.[6]

---

[6] We note that we are, of course, free to consider the evidence before the Commissioner, as well as any other relevant information, including that provided in the briefs, in determining whether there was a rational basis for the Commissioner's regulations. *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n*, 387 Mass. 122, 126 (1982), and *Grocery Mfrs. of Am., Inc.*, v. *Department of Pub. Health*, 379 Mass. 70, 81 (1979), are not authority to the contrary. These cases establish that a *plaintiff challenging* regulations must prove its case in judicial proceedings, and may not rely on material submitted to an agency. They do not limit judicial consideration of the bases upon which the Commissioner may have relied in promulgating the regulations.

The proposed regulation 47.07 (1) (a) would have required specified disease insurance to cover all conditions of similar severity and cost as cancer. The Commissioner considered this definition too ambiguous, and found that the twelve-disease list based on the Blue Cross-Blue Shield PIC was an acceptable alternative. This was eminently reasonable. It was established at trial that the PIC was issued in 1954, based in part on information gathered from physicians, nursing home operators, and the caseload records of visiting nurses, and still existed in the same basic form until 1979. The fact that Blue Cross-Blue Shield no longer marketed the PIC due to other provisions of regulation 47.07 (1) — principally the minimum benefits requirements — was not relevant to its rationality as a basis for the twelve-disease list in regulation 47.07 (1) (a).

The plaintiffs' evidence at most established that there was a difference of opinion among medical and insurance experts as to the utility of specified disease insurance, and the practicality and reasonableness of the requirements of regulations 47.07 (1) (a) and (d). Their evidence did not establish that the regulations lacked any conceivable basis. The plaintiffs did not even address the Commissioner's conclusion that regulation 47.07 (1) (a) was necessary to curb marketing abuses in the sale of cancer insurance. We also note that in invalidating regulation 47.07 (1) (d), the judge relied on evidence that the regulation would make specified disease insurance difficult to market, so that "[f]or all practical purposes, the free-standing specified disease policy will be a thing of the past." This was not relevant to show that regulation 47.07 (1) (d) lacked a rational basis, but rather amounted to a disagreement by the judge with the Commissioner's judgment that such policies were detrimental to the public's health care needs.

As we have emphasized, judicial review of regulations should not become a de novo trial in which the trial judge decides whether a challenged regulation is reasonable based on the evidence presented. Absent some other illegality, the scope of review is limited to the question whether the plain-

tiff has established that there is no conceivable basis on which the agency could have relied, not whether the plaintiff has shown that the regulations are not supported by other evidence, no matter how substantial. This deference is necessary to ensure that courts do not interfere with the separation of powers between the Legislature and the judiciary by substituting their judgment for that of the agency charged with the administration of the legislative mandate. See *Shell Oil Co.* v. *Revere, supra* at 688.

We conclude that regulations 47.07 (1) (a) and (d) are not arbitrary and capricious. In light of the foregoing, we need not address the Commissioner's other objections to the conduct of the trial.

3. Finally, we consider the judge's ruling that the Commissioner could not withdraw his approval of new sales of American's and Union's previously approved cancer-risk insurance policies without an adjudicatory hearing. We emphasize that the disputed regulations do not attempt to rescind policies already sold, but merely withdraw approval of future sales to new purchasers of previously approved policies.[7] Section 110E provides: "When a rule or regulation has been adopted pursuant to this section and an individual policy of . . . sickness insurance form regulated by [§ 108] is not in compliance with such rule or regulation, such noncompliance shall be grounds for a withdrawal of approval of such policy form and the commissioner may withdraw his approval of any such form upon written notice to the insurer specifying his reasons therefor." The plain language of the statute authorizes the Commissioner to withdraw approval "upon written notice to the insurer." This is the procedure which the Commissioner considers is to be followed in withdrawing approval of previously approved policies which do not comply with the new regulations.

---

[7] In his brief, the Commissioner noted that "[e]xisting insurance contracts remained in force and renewals of such existing contracts were not prohibited by . . . any . . . regulation."

The plaintiffs argue that § 110E should not be treated as authorizing regulations under which the Commissioner may withhold approval of policies, or withdraw approval of policies previously cleared by his office under c. 175, § 108, without first granting the insurer an adjudicatory hearing and a right of judicial review, as spelled out in § 108.[8] The judge agreed, relying on a perceived linkage between §§ 108 and 110E. Accordingly, the judge concluded that the "Commissioner is unwarranted in holding that previously approved health . . . policies, which do not now comply with the requirements of . . . [the regulations] may be condemned for further sale or use without first offering the affected insurer the due process rights spelled out in section 108, and that any action he may have taken thus far to revoke the good standing of such policies would do violence to rights of constitutional due process and should be declared null and void."

General Laws c. 175, § 108, is the basic statute applicable to the delivery or issuance of individual accident and sickness insurance policies. The statute authorizes the delivery and issuance of a health and accident policy if approved by the Commissioner. If no action is taken within thirty days of the filing of the policy form with the Commissioner, the form is deemed to be approved. Once a policy form is approved, it cannot be disallowed for further use unless the disallowance follows the procedural steps outlined in subsections 8 B, and C, which include notice, an adjudicatory hearing, and judicial review under G. L. c. 30A, § 14 (8).

The plaintiffs base their argument on the reference to § 108 in § 110E, and on the legislative history of § 110E. An earlier draft of this portion of § 110E stated that when a policy is not in compliance with a regulation adopted under § 110E, it "shall . . . be deemed to be disapproved as of a date specified in such regulation not less than sixty days fol-

---

[8] On this procedural ground, Union also objected to portions of the regulations governing Medicare supplement insurance.

lowing its effective date, without any further or additional notice other than the adoption of the regulation." The plaintiffs contend that the change from "deemed to be disapproved" to "grounds for a withdrawal" shows a legislative intent to require compliance with § 108, 8 B, which speaks of "withdrawal of approval."

Apart from the plain language of § 110E, the short answer to the plaintiffs' claim is that § 108, 8 A, B and C, governs curative, adjudicative proceedings, while § 110E establishes a procedure for preventative, rule making activity. It is undisputed that the regulations were rules. In addition, the plaintiffs' arguments lack merit. The reference in § 110E to § 108 merely defines the type of policies regulated by § 110E. The change in language from the earlier to the final draft appears to us to reflect a legislative intent to provide an insurer with notice that it is no longer in compliance with the law, so that it will not be caught unaware. A contrary interpretation would frustrate the very purpose of effective agency rule making, by requiring the Commissioner to comply with the more cumbersome adjudicatory procedures in order to put his rules into effect. We conclude that § 110E does not require the Commissioner to hold an adjudicatory hearing before withdrawing approval of future sales of policies for noncompliance with the new regulations.[9]

Nor do constitutional principles require an adjudicatory hearing in these circumstances. The plaintiffs' interest is in future sales to new purchasers of previously approved policies. This is not a property interest the deprivation of which requires a hearing to satisfy due process. See *Pronghorn, Inc.* v. *Licensing Bd. of Peabody,* 13 Mass. App. Ct. 70, 72-73 (1982).

The judgments are reversed and judgments shall be entered declaring that the regulations here in issue are valid.

*So ordered.*

---

[9] In light of our holding, we do not address the Commissioner's claim that the so called readability statute, G. L. c. 175, § 2B, authorizes the Commissioner to withdraw approval without a hearing of policies which do not comply with the new regulations.