Cratsley, J.
At issue in this case is the Lead Poisoning Prevention Act (“Lead Law”), codified at G.L.c. 111, §190 etseq., and a Tenant Law Notification Form (“Notification Form”) which was sent out by the Massachusetts Childhood Lead Poisoning Prevention Program (“CLPPP”). Defendant Lewis Bradford Prenney, in his capacity as Director of CLPPP, has moved for summary judgment pursuant to Mass.R.Civ.P. 56. As grounds for his claim, the defendant states; (1) plaintiffs have failed to establish that they have standing to bring this action because they have failed to demonstrate the existence of any legally cognizable harm to themselves, (2) the content of the Tenant Lead Law Notification Form is committed to the discretion of the Director of CLPPP and that discretion has not been abused, and (3) the sodium sulfide regulation which plaintiffs challenge in this action has a rational basis in sound medical practice and current technical knowledge. The plaintiff, Massachusetts Rental Housing Association, Inc. (“MRHA”), has moved for partial summary judgment on two of CLPPP’s alleged violations of the enabling legislation; (1) that the sodium sulfide regulation is an outmoded and unreliable test to determine the presence of a dangerous level of lead, and (2) the Notification Form erroneously states that members of plaintiffs organization, if they are owners of rental property built before 1978, have a duty to inspect for lead when, in fact, no such duty exists. The plaintiffs claim that there are actually three factual or legal errors contained in the Notification Form. However, they reason that they are entitled to summary judgment because the aforementioned statement is unsupported by statute, regulation or common law. For the reasons set forth below, the defendants’ motion for summary judgment is DENIED in part and ALLOWED in part and the plaintiffs’ motion for partial summary judgment is DENIED.
FACTS
The material facts are taken from the parties’ motions for summary judgment and supporting materials, parties’ oppositions and materials, and the statements of counsel at the hearing on the motions. The Lead Law is codified at G.L.ch. 111, §189A, et seq. The fundamental purpose of the law is to eliminate lead paint hazards from residential housing in Massachusetts in order to protect young children from the threat of lead poisoning. The law requires that the Department of Public Health establish a statewide program to deal with the prevention of lead paint poisoning.[1] The Lead Law further requires that the defendants prepare a Notification Form which must be available to property owners and tenants about the hazards of dangerous levels of lead and measures that can be taken to reduce the risk of lead exposure to children.[2]
Pursuant to this statutory obligation, CLPPP, on or about October 1994, prepared a document entitled ‘Tenant Lead Law Notification.” The Notification Form contains various medical, scientific and legal statements regarding lead poisoning as well as a statement of property owners legal obligations as set forth in the General Laws and regulations. Upon review of a draft copy of the Notification Form, members of the plaintiff associations and the individual plaintiffs objected to the text of the form, citing numerous factual and legal inaccuracies such as (a) “A home with lead paint must be deleaded for a lead poisoned child to get well,” and (b) “Remember, the only way to permanently lower the *676 risk to your child getting lead poisoned is to have your home deleaded if it contains lead paint.” The plaintiffs particularly objected to the statement, “An owner of a home built before 1978 must have the home inspected for lead if a child under six years old lives there.”
On or about August 1, 1994 CLPPP, despite plaintiffs’ numerous objections and concerns, began distributing the Notification Forms.
In addition to the plaintiffs’ concerns about the potentially misleading and misstated language in the Notification Form, they allege that the use of sodium sulfide as a means of detecting dangerous levels of lead in paint violates its enabling statute set forth at G.L.c. 111, §194.[3] The regulations promulgated by the Director permit the use of two testing technologies to detect dangerous levels of lead in paint in residential housing; x-ray fluorescence analysis and a chemical spot test using sodium sulfide. 105 C.M.R. §460.020. Plaintiffs allege that the sodium sulfide, which Massachusetts has chosen to use, is an inaccurate and outmoded means of detecting dangerous levels of lead in paint and, as such, does not comport with sound medical practice and current technical knowledge.
DISCUSSION
I. Summary Judgment Standard
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass R. Civ. P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue as well as demonstrating that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Id. at 17.
II. Legal Issues
A. Defendants’ claim that plaintiffs do not have standing.
The defendants assert that the plaintiffs have failed to establish that they have standing to bring this action. Defendants claim that the plaintiffs have failed to demonstrate the existence of any legally cognizable harm sufficient to confer standing upon them. Although traditionally courts do not like to interfere with the running of the other branches of government, Massachusetts courts have followed the established principle that,"... persons who have themselves suffered, or who Eire in danger of suffering, legal harm can compel the courts to assume the difficult and delicate duty of passing upon the validity of the acts of a coordinate branch of the government.” Kaplan v. Bowker, 333 Mass. 455, 459 (1956). In a previous decision by this Court (Hinkle, J.), it was determined that the plaintiffs do have standing in this litigation.[4] There is no reason why my colleague’s previous ruling should not stand. As such, the plaintiffs have standing to bring this claim.
B. The Notification Form
Plaintiffs claim that they have suffered and will continue to suffer harm from the inclusion of three allegedly inaccurate statements[5] in the text of the Notification Form. Plaintiffs allege that the first two sentences contain factual inaccuracies in violation of the Lead Law. Moreover, in their motion for partial summary judgment they have chosen to focus on the sentence which reads, “ An owner of a home built before 1978 must have the home inspected for lead if a child under six years old lives there,” alleging that this statement contains legal inaccuracies in violation of the Lead Law.
G.L.c. 111, §190 gives CLPPP broad, discretionary authority to promulgate regulations in accordance with the Lead Law. An agency’s power to make regulations is delegated to it by the Legislature. Borden, Inc. v. Commissioner of Public Health, 388 Mass. 707, 721, (citing, inter cilia, Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185-86 (1935)), appeal dismissed, 464 U.S. 923 (1983). The appropriate standard of review for an agency action that does not involve either adjudication or rule making is “. .. error of law or abuse of discretion, measured by the ‘arbitrary and capricious’ test.” Police Comm'r of the City of Boston v. Personnel Administrator of the Dept. of Personnel Admin., 39 Mass.App. 360, 363 (1995) (citing Casswell v. Licensing Commn. for Brockton, 387 Mass. 864, 877-78 (1983)). “. . . [A] plaintiff challenging a regulation as arbitrary and capricious bears the heavy burden of ’’proving on the record ‘the absence of any conceivable ground upon which [the rule] may be upheld.’ “ American Family Life Assurance Co. v. Commissioner of Insurance, 388 Mass. 468, 478 quoting Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 776 (1980), quoting Colella v. State Racing Comm’n, 360 Mass. 152, 156 (1971).
Applying these principles this Court concludes as a matter of law that the plaintiffs cannot meet their burden of proof for the following reasons:
(a) Plaintiffs’ claim that the two statements, “A home with lead paint must be deleaded for a lead poisoned child to get well,” and “Remember, the only way to permanently lower the risk of your child getting lead poisoned is to have your home deleaded if it contains lead,” are factually inaccurate.
Massachusetts courts have long held that judicial review of regulations should not evolve into a new trial in which the court has to decide whether a challenged regulation is reasonable based on the evidence presented. “Absent some other illegality, the scope of review is limited to the question whether the plaintiff has established that there is no conceivable basis on *677 which the agency could have relied, not whether the plaintiff has shown that the regulations are not supported by other evidence, no matter how substantial.” American Family Life Assurance Co. v. Commissioner of Ins., 388 Mass. at 479-80. The court grants this deference to ensure that the separation of powers between the Legislature and the judiciary remains intact and that they do not interfere or “substitute their judgment for that of the agency charged with the administration of the legislative mandate.” Id. at 480 (citing Shell Oil Co., v. Revere, 383 Mass. 682, 688 (1981)).
Plaintiffs contend that the aforementioned statements are contrary to prevailing medical literature. First, plaintiffs assert that children suffer from elevated lead levels for many reasons unrelated to the presence of lead paint in a home-. Defendants acknowledge in the Notification Form the possibility of lead poisoning resulting from a source other than lead paint in the child’s home, but they firmly assert in this litigation, through expert affidavit, that in the overwhelmingly majority of cases a child’s lead poisoning will have been caused by lead paint in the child’s home. Their expert’s affidavit states that once a child has been poisoned, in order for that child to obtain a negative lead balance (wherein the body’s burden of lead is lessening because the body is eliminating more lead than is being taken in), the home must be deleaded. Defendant’s expert witness states that if a child has an ongoing exposure to lead that child can never achieve a negative lead balance since the rate of lead’s elimination from the body is so slow. Plaintiffs also contend that this statement in the Notification Form will misinform tenants and parents about the different ways to minimize the risk of lead poisoning.
Second, plaintiffs contend that the sentence “Remember, the only way to permanently lower the risk of your child getting lead poisoned is to have your home deleaded if it contains lead,” is inaccurate. Plaintiffs assert, through expert affidavit, that it is well established that if steps are taken to maintain a clean environment and to prevent the ingestion of lead a child can remain healthy or recover from prior lead ingestion notwithstanding the presence of lead in his or her environment. This affidavit further states that although proper deleading of a child’s home may lower the risk of that child becoming lead poisoned, deleading is not the “only way” to permanently lower that risk.
Defendants, through their expert, claim that the issue of lead balance is the key in reducing a child’s lead burden and that children who live in homes which contain lead-based paint have higher blood lead levels than those children who live in homes without lead-based paint. This expert states that although there are other ways to lower the blood lead levels of children, these methods are not permanent and certainly can not keep the child’s blood lead level low if the child remains in a home that has lead hazards.
Plaintiffs have a formidable burden of proving the absence of any conceivable ground upon which the regulation with its challenged sentences can be upheld. Worcester Sand & Gravel Co., Inc. v. Board of Fire Prevention Regulations, 400 Mass. 464, 467 (1987). They are unable to do so in the instance of these two sentences in the Notification Form. Additionally, since CLPPP is granted broad discretionary power to implement the standards and requirements of the Lead Law, a court “does not substitute its judgment for that of the agency nor do they assess the effectiveness of alternative means.” Commonwealth v. B & W Transportation Inc., 388 Mass. 799, 805 citing Blue Hills Cemetery, Inc., v. Board of Registration in Embalming & Funeral Directing, 379 Mass. 368, 375 (1979). Furthermore, although the parties’ expert witnesses disagree, or at least differ, in their conclusions about lead poisoning and how to permanently abate it, that alone is insufficient to justify a declaration that the statements are without rational basis. “If the question is fairly debatable, [the court] cannot substitute our judgment for that of the [agency’s].” Worcester Sand and Gravel Co., Inc, v. Board of Fire Prevention Regulations, supra at 467. For the aforementioned reasons, it is this Court’s decision that these two sentences shall legally stand as written in the Notification Form.
Therefore, plaintiffs’ motion for summary judgment is DENIED and defendants’ motion for summaryjudgment is ALLOWED.
(b) Plaintiffs’ contention that the sentence, “An owner of a home built before 1978 must have the home inspected for lead if a child under six years old lives there,” is an inaccurate statement of a property owner’s legal obligation to their tenants.
Specifically they assert that neither G.L.c. 111, §189 et seq. nor C.M.R. 460 et seq. requires that the owner of a home built before 1978 inspect for lead at his or her own expense, if a child under the age of six lives there without a showing of some specific cause for the inspection. G.L.c. 111, §197(a) requires the owners of homes built before 1978 to delead a home in which a child under six resides.[6] Defendants argue, and this court agrees, that it was the Legislature’s intention to establish an inspection duty in order to enforce the mandatory abatement[7] of lead hazards.
“Dangerous levels of lead” as described in the definition of “abatement” are certain levels of lead which can be discerned by two alternative methods of detection. 105 C.M.R. §460.020. The goal of the Lead Law is to eliminate lead paint hazards from the Commonwealth’s housing. Without an inspection requirement, enforcement of the provisions of the Lead Law regarding abatement would be nearly impossible. G.L.c. 111, §197(a) clearly states that a home that houses a child under six must be deleaded. In addition the Supreme Judicial Court has noted that, “[s]ection *678 197 imposes a duty to remove or cover lead paint, plaster, and other material when a child under six years of age resides in the premises. Neither Section [197 or 199] imposes that duty only if the owner knew or should have known of the risk or only if the premises had been inspected and a compliance order had been issued.” Benscome v. Kokoras, 400 Mass. 40, 43 (1987). Therefore, it is entirely logical that if a house built before 1978 with a child under six living in it has to be deleaded because it contains dangerous levels of lead, there has to first be an inspection to see if the deleading is necessary.
For the reasons set forth above, plaintiffs’ motion for summary judgment as to this statement is DENIED. Defendants’ motion for summary judgment is ALLOWED.
C. Sodium sulfide as a reliable means for testing of dangerous levels of lead.
The appropriate standard of review of an agency regulation is whether that regulation is illegal, arbitrary or capricious. See Borden, Inc. v. Commissioner of Public Health, 388 Mass. 707, 722 (1983). Plaintiffs assert that the use of sodium sulfide as a method of detecting dangerous levels of lead does not comport with sound medical practice and current technical knowledge. G.L.c. 111, §194 specifically requires that the defendants establish a comprehensive program for detecting sources of lead poisoning.[8] Pursuant to this mandate, the defendants promulgated 105 C.M.R. 460.020 in 1974 which specifically identifies the use of sodium sulfide solution as one of two approved methods of detecting dangerous levels of lead.[9]
As stated supra, an agency’s power to make regulations is delegated to it by the Legislature. Id. at 721 (citing inter alia, Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185-186 (1935)), appeal dismissed, 464 U.S. 923 (1983). The Supreme Judicial Court has ruled that a regulation is accorded, “. .. the same deference we extend to a statute . . . Thus, we must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate. ” American Family Life Assurance Co. at 477, citing Consolidated Cigar Corp. v. Department of Pub. Health, 372 Mass. 844, 855 (1977).
Plaintiffs assert that the use of sodium sulfide as a means of detecting dangerous levels of lead, which was developed twenty (20) years ago, is highly inaccurate and cannot reliably discriminate between lead-based paint and nonlead based paint. Additionally, plaintiffs contend that sodium sulfide falsely identifies dangerous levels of lead in paint when either no lead is present in the paint or the paint does not contain dangerous levels of lead. Defendants, through expert affidavit, assert that the sodium sulfide test is quick, easy and relatively inexpensive and if used correctly, reasonably and accurately will detect dangerous levels of lead in paint. Our high court has held that, “[w]hether [the regulation is] wise of effective is not, of course, the province of [courts].” Commonwealth v. B & W Transportation Inc., 388 Mass. 799, 804 (1983), quoting Klein v. Catalano, 386 Mass. 701, 707 (1982). CLPPP “need not guarantee success when it chooses to regulate for the public safety.” Id. at 805. CLPPP has been charged with promoting the safety and development of Massachusetts’ children and if they have decided, through their research, that sodium sulfide is a reasonable and accurate way to identify dangerous levels of lead in housing, it is not for this Court to substitute its judgment. “Courts do not substitute their judgment for that of the agency nor do they assess the effectiveness of alternative means.” Id. at 805, quoting Blue Hills Cemetery, Inc. v. Board of Registration in Embalming & Funeral Directing, 379 Mass. 368, 375 (1979).
Although there are differing expert opinions about the validity of the sodium sulfide tests as a reliable method of detecting dangerous levels of lead, the materials before this Court at summary judgment do not persuade this Court that plaintiffs have any evidence to meet the arbitrary and capricious standard that they must establish. The fact that there may be somewhat more and somewhat less reliable tests is not for the determination of this Court, as long as the agency given the decision making task by the Legislature does not act in an arbitrary and capricious manner.
ORDER
For the foregoing reasons, this Court ORDERS that defendants’ motion for summary judgment is ALLOWED and that plaintiffs’ motion for summary judgment is DENIED.

 G.L.c. 111, Sec. 190 mandates that: “. .. the department shall establish a statewide program for the prevention, screening, diagnosis and treatment of lead poisoning, including elimination of the sources of such poisoning, through such research, educational, epidemiologic and clinical activities as may be necessary.”

 G.L.c. 111, Sec. 197A(d)(1) requires that the defendants prepare: “A standard [Notification Form] and such other materials as may be necessary to inform such tenants and property owners about the hazards associated with dangerous levels of lead; the symptoms and treatment of lead poisoning; [and] measures which can be taken by parents and property owners to reduce the risk of lead exposure to children . . . and the requirements of [the Lead Law] and regulations promulgated thereunder."
The Lead Law further provides that effective December 1, 1994: “Prior to entering into a tenancy agreement, the owner of premises or such other person to whom rent is to be regularly paid, shall provide a prospective tenant who is about to enter an agreement to rent premises with: (i) a copy of the materials and standard [Notification Form] completed pursuant to paragraph (1) . . . Any owner who fails to comply with the provisions of this section shall be liable for all damages caused by the failure to comply and, in addition, shall be subject to assessment of a penalty not to exceed one thousand dollars.” See G.L.c. 111, Sec. 197A(d)(2)(e)

 G.L.c. 111, Sec. 194 requires the Director to: “establish a comprehensive program for detection of sources of lead poisoning ... The means of detection and the amount of lead in the paint, plaster or other accessible structural material that produces the danger of lead poisoning shall be determined by regulation by the [DJirector in accordance with sound medical practice and current technical knowledge."

 In an order issued May 15, 1996, Justice Hinkle held: “In order to have standing, plaintiffs must show that they have suffered a legally cognizable injury. Animal Legal Defense Fund v. Fisheries & Wildlife Board, 416 Mass. 635, 638 (1993). As the plaintiffs argue, it is unlawful not only to deceive through advertisements held out to the public, but also in some cases not to undertake affirmative actions to prevent public misunderstanding. Commonwealth v. Ferris, 305 Mass. 233, 235 (1940). In this action the plaintiffs allege that they are required to distribute inaccurate material, and subject to a relationship of potential liability with regard to their tenants. The plaintiffs also allege that their properties are subject to a faulty scientific test which may subject them to liability, as well as provide the basis for unnecessary but government-mandated improvements to their properties. In light of these allegations, I rule that the plaintiffs as rental property owners have standing.”

 The three allegedly inaccurate statements are: (1) “A home with lead paint must be deleaded for a lead poisoned child to get well, ” (2) “Remember, the only way to permanently lower the risk of your child getting lead poisoned is to have your home deleaded if it contains lead paint," and (3) “An owner of a home built before 1978 must have the home inspected for lead if a child under six years old lives there.”

 G.L.c. 111, Sec. 197(a) states; “[w]henever a child under six years of age resides in any premises in which any paint, plaster or other accessible structural material contains dangerous levels of lead, the owner shall abate or contain said paint, plaster or other accessible structural materials, in accordance with the requirements of subsections (b) or (c).”

 G.L.c. 111, Sec. 189A defines “abatement" as: “the removal and replacement of paint, plaster or other accessible structural material containing dangerous levels of lead. (Emphasis added.)

 G.L.c. 111, Sec. 194 states; “The means of detection and the amount of lead in the paint, plaster or other accessible material that produces the danger of lead poisoning shall be determined by regulation in accordance with sound medical practice and current technical knowledge.”

 The second of the two approved methods of detection of lead is the use of an x-ray fluorescence analyzer. 105 C.M.R. 460.020(2).