Ostrach, Stephen, J.
Kathleen Lemansky and Bonnie Wolanaki each own property in Charlton. Each requests the Court order the defendant Charlton Water and Sewer Commission (“Commission”)[1] to permit them to connect their property with the Charlton public sewer system. For the reasons stated below, plaintiffs’ motions for summary judgment are denied and the cross motions made by the defendants are allowed.
Factual Analysis
As is to be expected when the parties have filed cross motions for summary judgment under Mass.R.Civ.P. 56, the relevant facts are largely undisputed. The following discussion summarizes those undisputed facts. Additional undisputed facts will be discussed when considering the parties’ legal contentions.
Lemansky owns a piece of property on Brookfield Road which abuts a public sewer line. Some time ago Lemansky built three duplex buildings on that property, each of which contains two two-bedroom units. Originally the Commission had imposed a “betterment assessment” of $8200 for that property, reflecting an assumed capacity of one development unit. When the Commission learned that Lemansky had actually constructed a total of six dwelling units, in August of 2003, it retroactively approved connecting those units to the town sewer and increased the betterment to $49,200. In November 2003 the Chairman informed Lemansky of the Commission’s decision and noted “there is no additional capacity allocated to the other sewer stub left on this property.” Approximately 60 days later Lemansky sought an abatement of that increased betterment, claiming that it was a “disproportionate allocation of the cost of the project.”
Ms. Wolanski owns over 36 acres of land on Center Depot Road. In August of 2002 she informed the Commission she was interested in constructing 76 two-bedroom units for an “over-55" population on that parcel. At that time the Commission indicated that it was facing capacity problems and that there might be "problems" connecting that property to the town sewer. In April 2003, Ms. Wolanski and Mr. Lemansky acquired, “for less than One Hundred Dollars ...” a strip of land running from Stafford Street to her property on Center Depot Road. This strip, which is 25 feet wide and over 200 feet long, was sliced off from a parcel owned by Mr. Chartier, who retained an easement for surface use and landscaping over the strip. The Chartier property was assessed a betterment for one single-family home, which had already been built on that properly and was already connected to the town sewer. In December, Mr. Lemansky, who is Wolanski’s partner, informed the Commission the development had been scaled back to 66 units and requested a letter that would authorize him to construct a septic system for the development.
For some time Charlton has been concerned about the adequacy of its municipal waste treatment system. In 2003 and again in 2004 the federal government issued violation notices for the Town’s NPDES permit for excessive discharges of copper, aluminum, phosphorus and ammonia, as well as other violations. In April 2003 the Town hired the engineering firm of Tighe and Bond to conduct a comprehensive review of its sewer system including estimates of future demands.
These factors eventually led the Commission to conclude that the maximum capacity of its treatment plant “is close to being exhausted” and, on May 24, 2004, to declare a six-month moratorium on any future ties to the sewer system that had not already been approved. That motion was sent to Town Counsel for review. Two weeks later, on Monday, June 7, 2004 the Commission adopted a moratorium on new connections to the town sewer until May 3, 2005 except for those for which prior written commitments had been issued.[2] Notice of that moratorium was posted on the Town website the next morning. By its terms the moratorium was to take effect upon publication, which did not occur until June 10. Meanwhile, on June 8, both Lemansky and Wolanski formally applied for sewer connections for their respective projects. Both applications were promptly denied by the sewer superintendent on that date, with the notation “no permit allowed.”
In February of this year, Tighe and Bond presented the Town with its report which recommended an extension of the moratorium. The Town has now extended the moratorium until May 3, 2006.
Legal Analysis I. The Moratorium
The parties have thoroughly briefed and argued this matter and provided the court with copious and helpful affidavits and other materials. Ultimately though the case comes down to a simple proposition: If a town reasonably concludes that it may be facing in the near term a lack of sewer capacity, may it adopt a temporary moratorium to enable it to prepare to address that problem in a comprehensive fashion? For the reasons given below, I believe the answer to that question is that it may.
Defendants correctly note that it is well-settled that municipalities have the authority to impose development restrictions, including reasonable time limitations, to control orderly growth while they proceed to consider comprehensive plans. See W.R. Grace v. Cambridge City Council, 56 Mass.App.Ct. 559, 567-68 (2002). Such moratoria are to be reviewed pursuant to the very relaxed criteria applicable to administrative regulations, that is, to prevail a plaintiff challenging the moratorium must show there is no substantial relationship between the moratorium and the agency’s *365 enabling legislation. Id. at 566; see also Sturges v. Chilmark, 380 Mass. 246, 252-53, 256-59 (1980) (suggesting that the need for time to analyze a problem is just such a rational basis). For decades it has been clear that reviewing courts are not to sit as super-agencies weighing scientific or technical issues committed to the expertise of administrative agencies. All that is required is some conceivable ground on which the regulation could be based and that ground can be shown in papers before the court: It need not be supported by “substantial evidence” in any agency record. See Borden, Inc. v. Commissioner of Public Health, 388 Mass. 707 (1983); American Family Life Assurance Co. v. Commissioner of Insurance, 388 Mass. 468, 477 (1983); Padden v. West Boylston, 64 Mass.App.Ct. 120, 125, 129 (2005). The expediency, wisdom or reasonableness of the regulatory enactment is not to be retried or reconsidered in court.
Applying that analysis, the moratorium here is plainly valid. The Town has provided more than ample demonstration that it faces serious sewer capacity issues. The repeated NPDES violations alone might have caused responsible officials to call a temporary halt to new, non-emergency connections. Further rational bases which justify the moratorium include: (1) problems associated with runoff and other issues presented by the turnpike which passes through Charlton; (2) concerns raised by the future impact on the Town’s sewer capacity presented by failing private septic systems near Glen Echo Lake; (3) the Town’s seemingly justified belief that it has a legal and equitable obligation to reserve sewer capacity for persons who, unlike Wolanski and Lemansky, have or will pay betterment assessments for connections; (4) the threat to Cady Brook presented by possible failure or overload at the Charlton Treatment Plant; and (5) the other topics addressed by Tighe and Bond. I conclude that the defendants have amply met their obligation to show a rational basis for the present moratorium. Of course, a moratorium must be that, not a final ban. Ultimately the Town must either reopen its process for allowing new connections or justify a final solution. But in light of the aggressive actions the Town has under way, including seeking over $3 million in new funds for a plant upgrade, the 23 months betweenJune 2004 and May 2006 is not outside the parameters for a “temporary” moratorium set by cases like Sturges (noting, at 252, the two-year restriction in Collura v. Arlington, 367 Mass. 881, 888 (1975)), and W.R. Grace.
In addition to their frontal, substantive attack on the moratorium, plaintiffs press several other challenges to its application to their properties. I find none of them persuasive.
The Town originally justified the moratorium under G.L.c. 83, §10 which provides that a “city, town or sewer district may... prescribe rules and regulations regarding the use of common sewers . . .” Plaintiffs contend that since the moratorium was enacted by the Commission rather than by the Town itself, it is not authorized by section 10. As defendants note, the flaw in this argument is that the legislative use of the term “regulation” presupposes action by an executive body such as the Commission rather than by the Town itself, which would only act via “by-law,” a point recognized by the use of that term elsewhere in chapter 83. Defendants also point out that elsewhere in chapter 83 (section 16) the legislature used “town” and “sewer commissioners” interchangeably in successive sentences. I find that the statute does authorize the Commission to issue regulations such as the moratorium, a conclusion buttressed by the fact that the “Town,” which appears as a co-defendant here, has expressed no dissatisfaction with the Commission’s actions.
Second, plaintiffs claim that their applications could not lawfully have been denied on June 8, based upon the moratorium since, by its terms, the moratorium was not effective until publication in a newspaper, which did not happen until June 10. While that proposition has a certain logical simplicity, it is also not persuasive. First, of course, it is unclear why the permit applications were denied cursorily on June 8. It is possible that, as discussed below, there were other defects in their applications such as, for example, plaintiff Wolanski’s failure to obtain a Clean Water permit from DEP or plaintiff Lemansky’s failure to demonstrate access to a public sewer. But even assuming that the denials were, at least in part, based upon the moratorium announced the previous day, no substantial interest of either plaintiff was injured by being informed of the denial on June 8 rather than waiting an additional two days until the moratorium was published. Certainly neither plaintiff had a right to expect a decision on her application within 48 hours, particularly since it appears that plaintiffs were well aware of the Commission’s decision to adopt the moratorium, a decision that precipitated their applications.
Finally, defendants also justify the moratorium under G.L.c. 40N, §8(m) which permits a commission to make regulations “not limited by [G.L.c. 83, §10].”[3] The Commission was created by St. 2002, c. 17 which gave it the “powers and duties conferred . . . chapter 40N.” Section 8(m) contains no requirement of prior publication. Plaintiffs challenge this argument, claiming that chapter 40N is not applicable to Charlton without acceptance at Town meeting. That seems inconsistent with the clear language of the special act which created the Commission that it “shall” have chapter 40N powers. I find that section 8(m) is an alternate ground for sustaining the Commission’s authority to adopt the moratorium, a ground which disposes of plaintiffs’ prematurity theoiy.[4]
Plaintiffs’ real argument is more weighty. They claim an entitlement to have their application determined on the basis of the rules in effect when the *366 application was filed. That argument, however, is founded on a fundamental misunderstanding of the effectiveness and application of administrative regulations to ongoing applications. A duly enacted regulation has the force of law. See Borden, Inc. v. Commissioner of Public Health, 388 Mass. 707, 723 (1983). It must be treated as binding law by all to whom it applies.
Where, as here, there was no vested right to an immediate decision on plaintiffs’ applications, the Commission was not only entitled, but required, to consider the application on the basis of the law, i.e., its own regulation, as it stood at the time of decision. It is well-recognized that, at least where no vested rights or extraordinary reliance interests can be shown,[5] pending applications are not entitled to be decided on the basis of the law as it stood at the time of application. This point is demonstrated by considering the reversed situation. Surely if an applicant were not entitled to a permit based on regulations in effect when he applied, he would not only expect, but demand, that a permit be issued if intervening regulatory changes removed a roadblock. For example, a person who applies today for a sewer connection in Charlton may reasonably expect his application to receive fair consideration at the subsequent date when the moratorium is lifted. Defendants correctly cite to R.V.H., Third, Inc. v. State Lottery Commission, 47 Mass.App.Ct. 712, 716 (1996), in support of this proposition. That case, in turn, cited Selectmen of Topsfield v. State Racing Commission, 324 Mass. 309, 314 (1949)(“...a change mad e in the law p ending the application for a permit or license rather than the law existing at the time of the filing is to govern action on the application . . .”). These cases accord with two hundred years of federal precedent supporting the same conclusion, namely that a body charged with applying the law to facts must apply the law or regulation as it stands at the time of decision. See Thorne v. Housing Authority of Durham, 393 U.S. 268, 281-82 (1969), citing United States v. Schooner Peggy, 5 U.S. 103, 110 (1801).
Plaintiffs’ final argument is that the moratorium is void because it conflicts with G.L.c. 83, §3 as interpreted by Clark v. Board of Water and Sewer Commissioners of Norwood, 353 Mass. 708 (1968). Clark is a somewhat opaque, three-page decision. In some measure it appears to reflect an auditor’s finding that the town’s motivations in denying the permit were not solely related to sewer concerns. Id. at 709. It is also distinguishable from the case before the Court because there was no regulatory moratorium in effect there. Finally it does not appear that the town in Clark was faced with anything approaching the clear danger that Charlton has shown here. See id. at 709 (noting the existence of “reasonably adequate present capacity”). Unless Clark is held to require every sewer applicant to be connected by every town on demand, which I conclude it does not, it does not avail plaintiffs here.
2. Other Grounds Supporting Denial
Defendants urge summary judgment against plaintiffs on grounds other than the effect of the moratorium. For the sake of completeness, and as an aid should plaintiffs seek review of this decision, I will address some of those arguments here.
A. Lemansky’s Failure to Exhaust Administrative Remedies
First, the town claims that Lemansky is not entitled to seek a sewer connection for her fourth unit because she did not appeal from the Commission’s earlier action which retroactively approved connections for the three duplexes she built on the site. It is true that the December 2003 letter from the Chairman told Lemansky that “there is no additional capacity allocated to the property” and implied that any future application would be denied. Consequently Lemansky should not have expected approval when she applied for a fourth connection on June 8. But that is not to say that the Commission had prospectively denied an application which had not been filed, which is essentially what its failure to exhaust remedies argument amounts to. It would not have been obvious to a party who had successfully obtained all that she requested, namely three sewer connections, that she nonetheless had to file a suit against the Commission because it had also opined that hypothetical future applications would not be approved. Indeed, it seems extremely likely that any such action would have been dismissed as premature which necessarily means that the failure to have brought it does not bar the bringing of this action.
B. Wolanski’s Application
In addition to the effect of the moratorium, Wolanski’s application for connection of a large “over-55" project to the Town’s sewer system was properly denied because she was required to and did not demonstrate that she had already obtained a permit from the Massachusetts DEP as required by G.L.c. 21, §43(2). As to this point I adopt the discussion at pages 4-8 of the Memorandum in Support of Defendants’ Opposition to Plaintiff Bonnie Berthiaume Wolanski’s Motion for Summary Judgment.
Second I agree with the Town that Wolanski has not shown that there is a public sewer line on Center Depot Road. The sewer line laid down that road by Lemansky, Wolanski’s partner, was not built by or for the Town, has not been accepted by the Town or approxed by DEP and, perhaps most importantly, Ms. Wolanski has never paid the Town a betterment assessment for that line. Its existence does not create any right in her favor to compel the Town to connect her development to the Town sewer. See Rafferty v. Town of Franklin, 63 Mass.App.Ct. 1114 (2005) (unpublished Rule 1:28 opinion) (“Under G.L.c, 83, §3, *367 there is no right to connect to a privately owned sewer line” even if that line is itself connected to a public sewer).
The situation with respect to Stafford Street is different. Unquestionably there is a public sewer line on that street. Ms. Wolanski (together with Mr. Lemansky) owns a 25-foot-wide strip that runs from Stafford Street over 200 hundred feet to connect to the large parcel on which she seeks to construct her project. That strip, she argues, must be considered as a part of the large parcel and that connection should allow her to compel the Town to connect whatever project she may wish to construct on that parcel to the Town sewer. Her position is not convincing.
The Town’s first response is equally literal. Since the strip and the parcel have different formal owners, the physical connection between the strip and parcel does not mean that the parcel is “land abutting upon a public . . . way in which a common sewer has been laid . . .” and therefore section three has no application.
There is also a more substantive rebuttal to Wolanski’s position. Allowing a developer to convert a narrow, unbuildable strip into a vested right to compel a massive sewer connection would be both unreasonable and inconsistent with basic aspects of chapter 83. When the Stafford Street sewer line was constructed, it was presumably designed in light of expected use. The Stafford Street footage in question here is that of a single-family home, now owned by Mr. Chartier. A betterment was assessed at that time based on the usage to be expected from such a use. If Mr. Chartier’s sale of a narrow strip of his frontage to Wolanski is sufficient to allow Wolanski to connect, at no additional betterment cost, 66 additional units, Wolanski would receive a major windfall which would be plainly inconsistent with G.L.c. 83, §15 which demonstrates a clear legislative intent that betterments should reflect actual use of the sewer. It would also make a mockery of any rational planning by the Town since a sewer line designed to handle the needs of a certain number of single-family homes could, under Wolanski’s theory, be required to handle the waste discharged by a massive project hundreds of feet away which was never envisioned when the line was designed and laid out. The absurdity of Wolanski’s position becomes clear when it is realized that once allowed, it could not be limited. If a 25-foot-wide strip is sufficient why not a 5-foot-wide strip and if hundreds of feet in length is enough, why not thousands? Under plaintiffs’ theory there seems to be nothing that would stop Mr. Chartier from microdividing his frontage on Stafford Street and offering on eBay unlimited sewer connections to all ofWorcester County as “abutting land.” The clear legislative intent in section 15 is that true abutters should be entitled to sewer connections and that they should be expected to pay their proportionate share of the costs of providing that service.[6] A statutory construction like that urged by plaintiffs is simply inconsistent with that common sense intent and must be rejected. See Sturges v. Chilmark, 380 Mass. 246, 261 (meaning of “adjoining” in land use law depends upon consideration of legislative purpose).
Conclusion
The Charlton moratorium was lawfully adopted and applies to both of the plaintiffs here. It requires denial of their applications for sewer connections. But for the moratorium, at least on the record now before the Court, Ms. Lemansky would apparently be entitled to her requested connection.[7] Ms. Wolanski’s application, however, is also defective because she has not demonstrated she has obtained required permits from the DEP and because she has not demonstrated that the parcel upon which she seeks to build her project is land “abutting” a common sewer for purposes of G.L.c. 83, §3.
ORDER
For the reasons stated, it is hereby ORDERED that the defendants’ motions for summary judgment are Allowed.

 Created by St. 2002, c. 17.

 On June 21, 2004, the Commission voted to “redo” the moratorium to allow new connections if necessary due to failed on-site septic systems.

 It should be noted, however, that the minutes of the June 7, 2004 Commission meeting refer only to section 10 and do not mention section 8(m).

 Finally, even assuming that the superintendent who denied the permit applications on June 8 jumped the gun, it would be pointless to reverse that decision and remand the matter. The moratorium is now in effect and would control any future decision by the Commission. In fact at its June 21, 2004, meeting the Commission noted that the “Lemansky/Wolanski” request “falls under the moratorium and was not previously approved.”

 See Thorne v. Housing Authority of Durham, 393 U.S. 268, 282 (1969), discussing exceptions if necessary “to prevent manifest injustice,” a situation not presented by plaintiffs’ decision to rush to file their applications the day after the Commission announced its moratorium.

 This is a proposition that Lemansky at least accepts since, as noted above, she sought an abatement of her betterment assessment claiming a “disproportionate allocation” of the cost.

 Of course, I express no opinion as to whether the Commission might not have other bases upon which to deny a future application by Lemansky should the moratorium end, or be invalidated by higher authority.